Galusha and another vs. Sherman and others.

Galusha and another, Respondents, vs. Sherman and others, Appellants.

*December 18, 1899 — January 9, 1900.*

*Equity: Findings: Practice: Accord and satisfaction: Duress: Rescission of contract: Title to negotiable paper by assignment of mortgage.*

1. The proper practice in an equity case is for the trial court to make findings covering specifically and separately each material fact in issue.

2. A controversy between two persons, actual and in good faith, is a proper subject for a binding contract of settlement, no matter what may be the real merits of the claim upon either side.

3. In the circumstances stated in the foregoing proposition, a settlement, free from mutual mistake of fact or mistake upon one side and fraud upon the other, is binding between the parties thereto without regard to which gets the best of the bargain or whether all the gain be in fact on one side and all the sacrifice on the other.

4. If, in making a contract, one party to the transaction be incapable of exercising his free will by reason of threats made by the other for the purpose of producing such condition, to the end that he may obtain such contract, such party may, at his option, repudiate such contract on the ground of duress.

5. What constitutes duress is matter of law; whether duress existed in a particular transaction is matter of fact. There is no legal standard of resistance which a person acted upon must come up to at his peril of being remediless for a wrong done to him, and no general rule as to the sufficiency of facts to produce duress. The question in each case is, Was the person so acted upon by threats of the person claiming the benefit of the contract, for the purposes of obtaining such contract, as to be bereft of the quality of mind essential to the making of a contract, and was the contract thereby obtained?

6. The doctrine, that in order to produce duress by threats there must be such threats as are reasonably necessary to control by fear the free will power of a person of ordinary firmness and courage, is not the true doctrine or the law of this state.

7. While it is true that findings of fact requisite to avoid a contract on the ground of fraud must be based on clear and satisfactory evidence establishing such facts, where the trial court decides in favor of the existence of such facts on the evidence, such decision cannot be disturbed on appeal unless clearly wrong.

8. One who takes title to a promissory note, payable to the order of a person therein named, merely by a transfer of the indebtedness contained in the assignment of the mortgage securing such note, is not entitled to the benefits of the law merchant as to such note, but holds it subject to the equities that would affect it in the hands of his assignor.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Eau Claire county: JAMES O'NEILL, Circuit Judge.  *Affirmed.*

Action in equity to set aside a note and mortgage on the ground of duress.   The issues made by the pleadings sufficiently appear from the facts found by the trial court, which are in substance as follows:   October 29, 1894, *Bradley B. Sherman*, claiming to have been injured by eating impure meat, believing it to be wholesome, which was furnished to him for food by *D. H. Galusha* with knowledge, or reasonable means of knowledge, of its character, commenced an action against *Galusha* to recover compensation for such injury to the amount of $5,000.    *A. J. Sutherland* was *Sherman's* attorney.    He employed *J. H. Langdon* to serve the summons and complaint, which service he performed and then advised *Galusha* to settle the claim, accompanying such advice by an assertion that if he did not do so he would be prosecuted criminally and sent to state's prison for from three to fourteen years.   *Langdon* induced *Galusha* to accompany him to *Sutherland's* office, where he was induced to mortgage his farm for $1,000 to secure a note for that amount payable in three years, with interest thereon at the

rate of eight per cent. per annum, in settlement of the controversy. *Sherman* assigned the note and mortgage to *Sutherland* and the latter assigned the same to *H. V. Scallon,* both assignments being recorded November 5, 1894. *Galusha* was a man of little education and experience, of a nervous temperament, and easily frightened. The fact that a claim was made against him for more than he was worth, accompanied by threats of imprisonment for a long term of years if he did not settle it, deprived him of his freedom of will, and while he was in that condition the note and mortgage were secured. Such note and mortgage were given without consideration. The plaintiff *Henrietta Galusha* signed the note and mortgage in the absence of her husband, and in such a state of fear and excitement, caused by threats made to her, that it was not her voluntary act. The mortgaged property was worth $3,000. Defendant *Scallon* is not the *bona fide* purchaser of the note and mortgage. On such facts judgment was awarded to plaintiffs, declaring the note and mortgage null and void and requiring them to be surrendered for cancellation, and for costs against defendants. There was evidence tending to prove that at *Sutherland's* office *Galusha* was locked in a room with *Sutherland,* and there again threatened with arrest and imprisonment for from three to fourteen years if he did not settle, and that such threats were accompanied with such demonstrations on the part of *Sutherland* as to greatly distract *Galusha* and put him in fear of personal violence.

For the appellants there was a brief by *Wickham & Farr* and *L. A. Doolittle,* and oral argument by *James Wickham.*

*W. P. Bartlett,* for the respondents.

MARSHALL, J. The cause does not seem to have been properly determined by the trial court by a finding on each material fact in issue. Presumably the practice was followed of deciding the issues in a general way and then signing

findings prepared and presented by the successful party, without a sufficient examination of them to see whether all the material issues are properly and specifically determined. It is proper to permit the attorney for a prevailing party to prepare the findings, but his duty in that regard should be strictly confined to the drafting and submitting of a paper which, when signed and filed in the cause, will comply with the statute by containing an express adjudication as to the truth regarding each material issue and the legal results; and the judicial duty should always be performed of testing the paper by the decision made, before making it an official document.   True, errors in that regard are not necessarily prejudicial, so as to call for a reversal, but it is the law, which should be followed just the same, that the successful party is entitled to have each material issue decided and to have such determination specifically and separately stated in the findings.   While a trial court may neglect or refuse to perform the judicial duty in that regard, and without effect upon the final judgment, it is a matter of which the party so deprived of his legal rights may justly complain, and which this court may properly take notice of and condemn, in the interest of a careful administration of justice, whether the wrong affects substantial rights so as to call for relief by a reversal of the judgment, or not.

The findings of fact as originally signed in this case contained, as one of the adjudications, a decision that all the material allegations of the complaint were true, while there were several such allegations upon which there was no evidence whatever, and some that were disproved by the uncontroverted evidence.   That finding was stricken out by the circuit judge when his attention was called to it by the appellants' attorneys; but there was a refusal to find specifically upon some of the most material issues, either in the findings as prepared and signed, or when duly requested to do so by appellants' attorneys.   For instance, there was no

dispute but that *Sherman* ate meat at *Galusha's* table, which he believed, in good faith, caused him serious illness; that he commenced an action against *Galusha* to recover the damages caused to him by such illness, and that he and his attorney, and all persons concerned on his side of the controversy, down to and inclusive of the time the note and mortgage were given, honestly believed that *Galusha* knowingly, or with reasonable means of knowledge, furnished him dangerously impure meat to eat, thereby causing the injury of which he complained; that he was legally entitled to have *Galusha* make good the damages resulting from such injuries; that the note and mortgage were taken in satisfaction of such claim; and that the claim, in consideration thereof, was duly released. Notwithstanding that, the court refused to find, though requested so to do, that *Sherman* and *Sutherland*, in commencing and prosecuting the action, honestly believed that *Sherman* had a good cause of action against *Galusha* as set forth in the complaint; but on the contrary, found that the note and mortgage were given without consideration. Plain error was thereby committed. The evidence being undisputed that the claim made by *Sherman* was an honest claim, the court should have so found. That was the vital question on the subject of whether there was any consideration for the note and mortgage. It being undisputed that the supposed cause of action was released in consideration of the note and mortgage, the finding that they were given without consideration was directly contrary to the fact. The learned court, in another part of the findings, seems to have determined that *Sherman* did not have a cause of action in fact, and to have come to that conclusion because of the result of another action for damages brought against *Galusha* by a person circumstanced the same as *Sherman*, in regard to having eaten some of the alleged impure meat,— an action to which *Sherman* was not a party, and, obviously, by which he was not in any way legally

affected.   Under what theory the verdict in that case was evidence against *Sherman* on the fact, if it were a fact, that *Sherman* would not have been able, upon a trial of his case, to have recovered against *Galusha*, and that it turned the scale against him on the question of whether the note and mortgage were given without consideration, is not understood.

The settlement of an honest controversy between two parties is a good and sufficient consideration to support a contract of settlement.   The release of the claim on the one side, and the payment or agreement to pay upon the other, are, as between the parties, an exchange of equivalents which is irrevocable except upon the ground of mutual mistake, or fraud of one party and mistake of the other.   That is elementary.   Inequality of consideration, of itself, is not sufficient to avoid a settlement.   It is enough if the controversy be actual, in regard to which the issue may fairly be considered by both parties as doubtful.   1 Parsons, Cont. (8th ed.), 439; *Kercheval v. Doty*, 31 Wis. 476; *Van Trott v. Wiese*, 36 Wis. 439; *Turner v. Burnell*, 48 Wis. 221; *Harris v. Kennedy*, 48 Wis. 500; *Zimmer v. Becker*, 66 Wis. 527; *Continental Nat. Bank v. McGeoch*, 92 Wis. 286.   The law favors the right of parties to settle their matters of difference in their own way, and encourages efforts in that regard by holding such settlements conclusive, as above indicated, without regard to which party obtains the best of the bargain. So it is held that, where a claim is asserted on the one side in good faith and denied upon the other, presenting for consideration and determination a question involving a degree of certainty as to where the truth lies calling for a judicial determination to effect a settlement in the absence of an amicable arrangement between the parties, and such parties make such an arrangement settling their matter of difference, such matter is thereby as effectually closed and the result made as binding on them as if it were reached by the

solemn and formal judgment of a court having jurisdiction of the parties and of the subject matter. Mistake, as the term is here used, does not refer to the validity of the claim on either side, but to some fact or facts material to the settlement. Courts exist to remedy wrongs where they cannot be otherwise remedied by peaceable means. The whole policy of the law is rather to discourage than encourage a resort to them as a means to that end by promoting efforts to compromise and settle differences by contracts *inter partes*. If a controversy be actual and in good faith, it is a proper subject for a binding contract of settlement, no matter what the real merits of a claim may be upon either side; and if a settlement be made in regard to such subject, free from fraud or mistake, as before indicated, whereby there is a surrender or satisfaction, in whole or in part, of a claim upon one side in exchange for or in consideration of a surrender or satisfaction of a claim in whole or in part, or of something of value, upon the other, however baseless may be the claim upon either side or harsh the terms as to either of the parties, the other cannot successfully impeach the agreement in a court of justice. Such contracts are as binding as any that parties competent to contract can make. Said this court in *Kercheval v. Doty, supra*, quoting from a standard text writer with approval: "If it were necessary, in order to sustain an adjustment of conflicting claims, to determine their relative validity and value, no compromise would be possible, and the uncertainty, delay, and scandal would be incurred, which such arrangements are usually designed to avoid." "It is held in general in this country, that compromises are to be favored, irrespectively of the nature of the controversy compromised; and that they cannot be set aside because the event shows all the gain to have been on one side, and all the sacrifice on the other, if the parties have acted in good faith, and with a belief of the actual existence of the rights which they have respectively waived or abandoned." "A

compromise of doubtful rights will not, therefore, be opened or rescinded by chancery, even when unequal or harsh in its operation; nor where the only consideration for the relinquishment of a valid claim on the one side is the abandonment of an invalid one on the other."

From the foregoing it will be seen that on the question of whether there was a consideration for the note and mortgage, the primary question was whether a claim was honestly asserted on the one side and denied on the other; not whether the claim was actually valid or invalid. The trial court erroneously refused to find on that material question. Further, it appears that the subject, of whether the claim asserted by *Sherman* was one upon which he could have recovered against respondents, was not a subject for consideration in this case at all, except as bearing on the question of his good faith; and the finding on that subject, as a basis for a finding of want of consideration for the settlement, was error. Further, the finding that the settlement and the note and mortgage were without consideration, in face of the undisputed evidence that such note and mortgage were given to settle a claim honestly made by *Sherman*, was erroneous.

Notwithstanding what has been said, it does not follow that the judgment must be reversed, if the finding on the subject of duress is sustained by the law and the evidence.

The trial court found that when the note and mortgage were executed, *Galusha* was not in the exercise of his free will, but was under the control of the will of *Langdon* and *Sutherland*, and that he was deprived of his own will power by the wrongful acts of the two persons named. That finding was, in the main, based on the circumstance that a complaint had been served upon *Galusha*, claiming damages to an amount sufficiently large, if established to its full extent, to absorb his entire property, and, upon disputed evidence that *Langdon*, who served the papers, urged him to visit

*Sutherland*, the attorney for *Sherman*, and settle the contro-
versy, stating that if he did not do so he would be arrested
on a criminal warrant and sent to state's prison; that through
*Langdon's* influence, and accompanied by him, respondent
went to *Sutherland's* office; that he was there locked in a
room with *Sutherland*, or with *Sutherland* and *Langdon*,
and then threatened again with arrest and imprisonment
for from three to fourteen years unless he immediately set-
tled the suit by paying $1,000 or securing the payment of
such sum; that such threats were accompanied by profanity
on the part of *Sutherland* and by such demonstrations as to
produce a belief in the mind of respondent that he was in
danger of personal violence; that under such circumstances
respondent submitted to *Sutherland's* demand and executed
the papers in controversy, and also signed a communication
to his wife directing her to sign, and gave such communica-
tion to *Sutherland* to enable him to secure her signature in
the absence of her husband.

Appellants' attorneys contend that, assuming that the evi-
dence on the part of respondents proves all that it tends to
prove, the wrongful acts were not sufficient to constitute
duress, hence not sufficient to warrant the finding that re-
spondent was deprived of the free exercise of his will. In
support of that, many suggestions are made and authorities
cited which seem to call for a brief consideration of the law
of duress as understood by this court. It is a branch of the
law that, in the process of development from the rigorous
and harsh rules of the ancient common law, has been so
softened by the more humane principles of the civil law, and
of equity, that the teachings of the older writers on the sub-
ject, standing alone, are not proper guides. The change
from the ancient doctrine has been much greater in some
jurisdictions than in others. There are many adjudications
based on citations of authorities not in themselves harmoni-
ous, and many statements in legal opinions based on the

ancient theory of duress, which together create much confusion on the subject, not only as it is treated by text writers, but by judges in legal opinions. Anciently, duress in law by putting in fear could exist only where there was such a threat of danger to the object of it as was deemed sufficient to deprive a constant or courageous man of his free will, and the circumstances requisite to that condition were distinctly fixed by law; that is to say, the resisting power which every person was bound to exercise for his own protection was measured, not by the standard of the individual affected, but by the standard of a man of courage; and those things which could overcome a person, assuming that he was a prudent and constant man, were not left to be determined as facts in the particular case, but were a part of the law itself. Co. Litt. 253. Said Sir William Blackstone (volume 1, p. 130): "Whatever is done by a man to save either life or member, is looked upon as done upon the highest necessity and compulsion. Therefore, if a man through fear of death or mayhem, is prevailed upon to execute a deed or do any other legal act, these, though accompanied by all the other requisite solemnities, may be afterwards avoided, if forced upon him by a well-grounded apprehension of losing his life, or even his limbs, in case of his noncompliance." "The constraint a man is under in these circumstances is called in law *duress*." "A fear of battery or being beaten, though never so well grounded, is no duress, neither is the fear of having one's house burned, or one's goods taken away and destroyed, because in these cases, should the threat be performed, a man may have satisfaction by recovering equivalent damages. But no suitable atonement can be made for the loss of life or limb." Duress of imprisonment existed, by the old rule, only where there was actual, illegal restraint of liberty. The doctrine was, "If a man be imprisoned by order of law, the plaintiff may take a feoffment of him, or a bond for his satisfaction, and for the deliverance of the de-

fendant, notwithstanding that imprisonment; for this is not by duress of imprisonment, because he was in prison by course of law, for it is not accounted in law duress of imprisonment, but where either the imprisonment, or the duress that is offered in prison, or at large, is tortious and unlawful." 2 Bac. Abr. 771. Thus it will be seen that, in the early days of the common law, duress, strictly so called, was matter of law. It was pleadable as a defense or as material to a cause of action, by alleging the existence of specific circumstances legally sufficient to constitute duress, and was established *prima facie* by proving the truth of such allegations. The effect of the facts so established was determinable as an inference of law, not of fact. Oppression of one person by another, causing such person to surrender something of value or some advantage to such other, not amounting to duress within the rigorous rules of law, regardless of whether the oppression actually deprived the oppressed party of the exercise of his free will, was remediless except by an appeal to a court of equity, where a remedy was obtainable on the ground of unlawful compulsion. Id. 772.

It is interesting to follow the development of the law from the early period mentioned. To do so in this opinion would draw it out to a far greater length than is advisable; but we will proceed sufficiently to show the conflict in authorities on the subject, what has led to it, the correct doctrine at the present time, and the unsoundness of the contentions of appellants' counsel as to the law applicable to this case when tested by such doctrine. That seems to be necessary in order to show that the theories, advanced by appellants' counsel, to support the claim that the finding as regards respondent suffering from wrongful deprivation of his will power at the time he made the papers in controversy is not warranted by the evidence are unsound. Those theories are: (1) Oppression does not constitute duress unless sufficient to overcome the will of a person of ordinary courage; (2) a

threat to arrest a person for an offense of which he is not guilty does not constitute duress; (3) a threat to arrest a person on a charge that does not constitute a criminal offense does not constitute duress. All of such theories have some support, but all are out of harmony with the real foundation principle of duress, which is that it is the condition of the mind of the wronged person at the time of the act sought to be avoided, not the means by which such condition was produced. Such theories are also out of harmony with the theory upon which duress of a contracting party renders the contract voidable as to him, which is that the free meeting and blending of the minds of contracting parties are requisite to a binding contract.

Early in the development of the law, the legal standard of resistance that a person was bound to exercise for his own protection was changed from that of a constant or courageous man to that of a person of ordinary firmness. That will be found by reference to some of the earlier editions of Chitty on Contracts. See 1 Chitty, Cont. (11th ed.), 272; 2 Greenl. Ev. 301. But the ancient theory that duress was a matter of law to be determined *prima facie* by the existence or nonexistence of some circumstance deemed in law sufficient to deprive the alleged wronged person of freedom of will power, was adhered to generally, the standard of resisting power, however, being changed so that circumstances less dangerous to personal liberty or safety than actual deprivation of liberty or imminent danger of loss of life or limb came to be considered sufficient in law to overcome such power. The oppressive acts, though, were still referred to as duress, instead of the actual effect of such acts upon the will power of the alleged wronged person. It is now stated, oftener than otherwise, in judicial opinions, that in determining whether there was or was not duress in a given case, the evidence must be considered, having regard to the assumption that the alleged oppressed person was a

Galusha and another vs. Sherman and others.

person of ordinary courage. The learned counsel for appellants have referred to some such authorities to support their claim that the finding under discussion is contrary to law, in that the threats made to respondent, assuming his evidence to be true, were not sufficient to deprive a person of ordinary firmness of his free will power. From that it is argued that the finding is unwarranted.

That one should be led astray on the question of there being a legal standard of resisting power, by which the sufficiency of the oppressive conduct claimed to have produced duress in a given case must be tested, is most natural in view of the number and character of the authorities to that effect. As we have seen, the text of Chitty and of Greenleaf both so clearly indicate. In *U. S. v. Huckabee,* 16 Wall. 414, a case generally cited as giving a very clear definition of duress according to the modern doctrine on the subject, Mr. Justice CLIFFORD said: "Unlawful duress is a good defense to a contract if it includes such degree of constraint or danger, either actually inflicted or threatened and impending, as is sufficient in severity or apprehension to overcome the mind and will of a person of ordinary firmness." On the same line, Mr. Justice COLERICK, in *Hines v. Comm'rs of Hamilton Co.* 93 Ind. 266, said, citing from 4 Wait, Act. & Def. 490: "Mere threats of violence, or of prosecution, are not enough to constitute duress. There must be a reasonable ground for creating an apprehension that the threats will be carried into execution, in the mind of a man of ordinary firmness and courage, and must operate upon him directly, so as to overcome his will." Similar language is used in legal opinions of courts of many of the states, as will be shown by reference to the following: *Youngs v. Simm,* 41 Ill. App. 28; *Harmon v. Harmon,* 61 Me. 227; *Morse v. Woodworth,* 155 Mass. 233; *Higgins v. Brown,* 78 Me. 473; *Wolfe v. Marshall,* 52 Mo. 167; *Burr v. Burton,* 18 Ark. 214; *Flanigan v. Minneapolis,* 36 Minn. 406; *Hor-*

*ton v. Bloedorn*, 37 Neb. 666. In the last case cited the following instruction to the jury was approved: "The threats, if any were in fact made, must have been of such a character as to naturally overcome the mind and will of a person of ordinary firmness, and deprive him, for the time being, of the power of mind and will to resist the demand by the person making such threats." Those authorities indicate adherence to the doctrine of a legal standard of resistence by which to test the alleged wrongful acts; also adherence, generally, to the old doctrine of the legal sufficiency of particular threats or acts to produce duress, the only change in the former element, from the ancient common law, being the substitution of resisting power of a person of ordinary firmness for that of a prudent and constant man; and the only change in the latter element being the addition of elements of less severity than actual imprisonment or danger of loss of life or limb, as being sufficient to deprive a person, of the legal standard of resisting power, of his free will, leaving the only question of fact to be determined by the jury, whether the will power of the oppressed person was in fact overcome in the particular case, the presumption, in the absence of evidence to the contrary, being in the affirmative.

It will be noted in an examination of the cases that the means used to overcome the person threatened are uniformly referred to as the duress, instead of the condition of mind produced thereby. In *U. S. v. Huckabee*, 16 Wall. 414, it is said, "Decisions of high authority adopt the liberal rule that contracts procured by threats of battery to the person, or of distraint of property, may be avoided by proof of such facts." In *Harmon v. Harmon, supra*, it is said that mere threats of criminal prosecution do not constitute duress without threats of immediate imprisonment. Similar language is found in *Hilborn v. Bucknam*, 78 Me. 485, and *Thorn v. Pinkham*, 84 Me. 101. In *Knapp v. Hyde*, 60 Barb. 80, it was held, fol-

lowing the old common-law doctrine, that in order to avoid an act on the ground of menace of arrest or imprisonment, it must appear that the menace was of unlawful imprisonment; while in *Hartford F. Ins. Co. v. Kirkpatrick,* 111 Ala. 456, it is said that the guilt or innocence of the alleged. wronged party, or the lawfulness or unlawfulness of the threats, are immaterial, the material and only material question being, Was the threat made for the purpose of overcoming the will of the person threatened, and did it have that effect, and was the contract thereby obtained?

Sufficient has been said to show the conflict that exists on the subject under discussion. The more advanced doctrine is that stated in the Alabama case cited. Under it, advantages obtained by what was considered duress by old common-law rules, or such rules as changed, in respect to the standard of resisting power which the threatened person is legally bound to exercise for his own protection or be remediless at law for the consequences, and in respect to the nature of the threats deemed legally sufficient to overcome a person of the legal standard of resisting power, and also advantages wrongfully obtained, though not by duress, in law, and remediable as such, but remediable in equity upon the ground of unjust compulsion, are now practically in one class. Duress, in its broad sense, now includes all instances where a condition of mind of a person, caused by fear of personal injury or loss of limb, or injury to such person's property, wife, child, or husband, is produced by the wrongful conduct of another, rendering such person incompetent to contract with the exercise of his free will power, whether formerly relievable at law on the ground of duress or in equity on the ground of wrongful compulsion.

The making of a contract requires the free exercise of the will power of the contracting parties, and the free meeting and blending of their minds. In the absence of that, the essential of a contract is wanting; and if such absence be

Galusha and another vs. Sherman and others.

produced by the wrongful conduct of one party to the trans-
action, or conduct for which he is responsible, whereby the
other party, for the time being, through fear, is bereft of
his free will power, for the purpose of obtaining the contract,
and it is thereby obtained, such contract may be avoided on
the ground of duress.   There is no legal standard of resist-
ance which a party so circumstanced must exercise at his
peril to protect himself.   The question in each case is, Was
the alleged injured person, by being put in fear by the other
party to the transaction for the purpose of obtaining an ad-
vantage over him, deprived of the free exercise of his will
power, and was such advantage thereby obtained?   If the
proposition be determined in the affirmative, no matter what
the nature of the threatened injury to such person, or his
property, or the person or liberty of his wife or child, the
advantage thereby obtained cannot be retained.   The idea
is that what constitutes duress is wholly a matter of law and
is simply the deprivation by one person of the will power of
another by putting such other in fear for the purpose of ob-
taining, by that means, some valuable advantage of him.
The means by which that condition of mind is produced are
matters of fact, and whether such condition was in fact pro-
duced is usually wholly matter of fact, though of course the
means may be so oppressive as to render the result an in-
ference of law.   It is a mistaken idea that what constitutes
duress is different in case of an aged person or a wife or
child than in case of a man of ordinary firmness.   As said
in *Wolff v. Bluhm*, 95 Wis. 257, the condition of mind of a
person produced by threats of some kind, rendering him in-
capable of exercising his free will, is what constitutes duress.
The means used to produce that condition, the age, sex, and
mental characteristics of the alleged injured party, are all
evidentiary, merely, of the ultimate fact in issue, of whether
such person was bereft of the free exercise of his will power.
Obviously, what will accomplish such result cannot justly

be tested by any other standard than that of the particular
person acted upon.  His resisting power, under all the cir-
cumstances of the situation, not any arbitrary standard, is
to be considered in determining whether there was duress.
The more modern text writers so state the law to be.

In Bishop on Contracts (§ 719) it is said, in substance, that
the proposition found in many of the cases that the threat
must be such as would excite the reasonable apprehension
of a person of ordinary courage, is certainly incorrect; that
it originated in the failure of the old writers (referring to
Coke on Littleton) to distinguish between the mind acted
upon and the thing menaced; that the law of contracts con-
siders the quality of the contracting mind, and therefore
holds the apparent, not real, consent of the subject or timid
person, or person of inferior intellect, as invalid as that of
the strongest and most independent understanding, though
the latter would not have been enthralled where the former
was.  In the last revisions of Chitty on Contracts, brought
out in 1890 and 1896 (page 199 of the latter), the old text
on the subject under discussion was changed to conform to
the doctrine as stated in Bishop on Contracts.  A compari-
son of it with the early text is one of the best demonstra-
tions that can be given of the great change that has taken
place in the law under discussion from the early rules on
the subject.  The following is the new text: "It has been
sometimes said that in order to avoid a contract entered
into through fear, the fear must be such as would impel a
person of ordinary courage to yield to it.  I do not think
this an accurate statement of the law.  Whenever from
natural weakness of intellect, or from fear — whether reason-
ably entertained or not — either party is actually in a state of
mental incompetence to resist pressure improperly brought
to bear, there is no more consent than in the case of a per-
son of stronger intellect and more robust courage yielding
to a more serious danger.  The difficulty consists not in an

Galusha and another vs. Sherman and others.

uncertainty of the law on the subject, but in its application to the facts of each individual case."

In Chitty's work on Commercial Law, printed in 1824 (p. 56), it is said that "fear, which is sufficient to avoid a contract, must be a present fear, occasioned by some present or future danger, not a mere suspicion of the approach of danger, nor such an apprehension as would arise in the mind of a weak or timorous man, but such as would alarm a firm man, such as the fear of death or of bodily torment; that the fear of battery, which may be slight, will not amount to duress as will the fear of mayhem or loss of life." In support of the later text of Bishop and Chitty, Jr., see 10 Am. & Eng. Ency. of Law (2d ed.), 341; *Cribbs v. Sowle*, 87 Mich. 340; *Overstreet v. Dunlap*, 56 Ill. App. 486; *Parmentier v. Pater*, 13 Oreg. 121; *Earle v. Norfolk & N. B. H. Co.* 36 N. J. Eq. 192; *Jordan v. Elliott*, 12 Weekly Notes Cases, 56; *Williams v. Bayley*, 1 App. Cas. 200; *Scott v. Sebright*, 12 Prob. Div. 21.

From the foregoing it will be seen that the true doctrine of duress, at the present day, both in this country and England, is that a contract obtained by so oppressing a person by threats regarding his personal safety or liberty, or that of his property, or of a member of his family, as to deprive him of the free exercise of his will and prevent the meeting of minds necessary to a valid contract, may be avoided on the ground of duress, whether the oppression causing the incompetence to contract be produced by what was deemed duress formerly, and relievable at law as such, or wrongful compulsion remediable by an appeal to a court of equity. The law no longer allows a person to enjoy, without disturbance, the fruits of his iniquity, because his victim was not a person of ordinary courage; and no longer gauges the acts that shall be held legally sufficient to produce duress by any arbitrary standard, but holds him who, by putting another in fear, shall have produced in him a state of

mental incompetency to contract, and then takes advantage
of such condition, no matter by what means such fear be
caused, liable at the option of such other to make restitu-
tion to him of everything of value thereby taken from him.

The law as indicated, though not discussed at any great
length in previous adjudications of this court, has always
been the ruling principle of its decisions.    In *Brown v. Peck*,
2 Wis. 261, it was said that if menaces are used, or equiva-
lent acts of violence, such as to have an undue influence
upon the party and to prevent the exercise of his own free
will in executing the contract, it is voidable.    True, the
court was there speaking of the power of a court of equity
to remedy a wrong, but the situation calling for such rem-
edy was, as the court said, that there was no contract ex-
isting between the parties for want of assent by one party
on account of the oppression to which he was subjected on
behalf of the other.

In *City Nat. Bank v. Kusworm*, 91 Wis. 166, and *Wolff v.
Bluhm*, 95 Wis. 257, the doctrine was stated in effect thus:
Where one, by the wrongful act of another, is put in fear
and thereby induced to make a contract or to forego some
act under circumstances which deprive him of the exercise
of his free will, duress exists; the wrongful act does not
constitute the duress, but the condition of mind produced
thereby.    The act must be of such a nature and made under
such circumstances as to constitute a reasonable, adequate
cause to control the mind of the threatened person, and
must have that effect; and the act sought to be avoided must
have been performed by such person while in such condi-
tion.    It will be noted that it was said, the cause producing
incompetency to contract through fear need only be rea-
sonably sufficient to overcome the will power of the partic-
ular person acted upon.    That it may be more or less than
that required to overcome the mind of a person of ordinary
firmness, according as the person acted upon is above or

below the average in mental ability to protect himself against the influence of fear, is obvious. There was unnecessarily added to a correct statement of the law, in *Wolff v. Bluhm*, a reference to the doctrine of the supreme court of Maine, as to the sufficiency of certain circumstances to constitute duress, not in harmony with the law as stated in this opinion. An arbitrary rule, that a threatened lawful arrest and imprisonment not implying harsh or unreasonable use of criminal process, and where no warrant has been issued and there is no danger of the threat being immediately carried out, is not sufficient to produce duress, seems unreasonable. Such, however, is the doctrine of the supreme court of Maine, and the cases supporting it will be found very generally cited by text writers and judges. That rule goes naturally with the doctrine that every person, without regard to actual mental power, is bound to come up to the standard of average men in that regard or suffer the consequences.

We have now reached a point where it clearly appears that the contention of counsel for appellants, that the testimony of the plaintiff, undisputed, is legally insufficient to produce duress, cannot be sustained, and it remains to be seen whether the finding that duress was in fact produced by the conduct of *Sutherland* and his confederate, *Langdon*, is contrary to the clear preponderance of the evidence.

Looking at the testimony of the several witnesses, as printed in the record, it is by no means certain but that the evidence preponderates to the side of the appellants, and that no clear case is made out such as is required to impeach a transaction for fraud. But when the circumstances disclosed are taken into consideration, the interest which the different witnesses had in the result, the opportunity that each had for knowing the facts in respect to which he testified, and everything appearing that aids in weighing the evidence and determining where the truth lies, doubt is

produced as to the correctness of the findings, which is rea-
sonably resolved in their favor by giving due weight to
those things which were available to the trial judge, and
presumably were considered by him, that could not be made
a part of the record.   This is peculiarly a case where op-
portunity to see the witnesses and observe their manner
while testifying is of great importance in judicial search
after truth.   That the learned judge who made the find-
ings studied the situation with the light that such oppor-
tunity cast upon it cannot be doubted, and the result is
embodied in the findings which we are asked to reverse.
There is a finding that respondent is a very nervous man
and easily subject to be imposed upon in the manner in
which it is claimed he was wronged.   That circumstance
was of importance in the case.   There is very little evidence
in the record in regard to it, but it is obvious that a per-
sonal study of the man during the trial, by one skilled in
such matters, could hardly have failed to reveal the truth,
without any direct evidence of the fact.   Considering re-
spondent as a man of average firmness, intelligence, and
experience, it would be unreasonable to say that the pre-
posterous assertions of *Langdon* and *Sutherland*, as to what
they could and would do with him in the event of his not
settling the *Sherman* claim, emphasized even by loud and
vehement expressions, by profanity and gesticulations, would
have affected him otherwise than by producing anger, amuse-
ment, or disgust; but a view of respondent and study of
him in court may easily have satisfied the trial court that
he was a man liable, under the circumstances in which he
was placed, to be deluded, and to regard falsehood as truth
and mere shamming as serious reality.

The record shows that a hard-working, middle-aged farmer;
not of sufficient intelligence to know his legal rights, was,
without previous negotiations for a settlement of an existing
doubtful claim, sued upon it for a sum perhaps in excess of

his entire fortune, the papers being served by a shrewd person specially employed for that purpose, instead of by an officer; that on the same day such person accompanied the defendant to the presence of the plaintiff's lawyer, and that an agreement was there obtained from such defendant to pay, in settlement of the controversy, an amount representing a large portion of his entire property,— probably the accumulation of many years of labor,— and to secure such agreement by a mortgage upon his home.   The transaction, of itself, is unnatural and unexplainable upon any reasonable theory other than that respondent was a weak man, easily influenced, and that considerable pressure was put upon him to produce the result accomplished.   The probabilities point that way in the absence of evidence explaining how the thing was brought about.   The explanation on the part of appellants is that respondent went to *Sutherland's* office of his own free will and out of a desire for an immediate settlement of the claim on the best terms possible, and that he desired the presence and assistance of *Langdon.*   That explanation does not strike one as reasonable.   Why should respondent desire, expect, or rely on help from the agent of the attorney for the adverse party in making a settlement? Why did he not go to some neighbor, acquaintance, or friend, or some lawyer, for counsel instead of relying on *Langdon?* Those questions are not answerable from the record except by respondent's own evidence that he was induced, by *Langdon's* threats, to believe that it was best for him to visit *Sutherland* and settle immediately in order to avoid arrest and imprisonment.   Why did he finally settle with the attorney for the adverse party and agree to surrender, in satisfaction of the claim made upon him, such a large proportion of his property, without taking time for reflection or making an effort to obtain counsel, when he could not have been prejudiced by waiting at least till near the expiration of the twenty days allowed in which to answer the complaint, be-

fore making a settlement ? Nothing in the record furnishes
an answer to that, except the evidence of respondent that
he was threatened with arrest and imprisonment if he did
not submit to the demand for a speedy settlement. The
very fact that respondent went to the office of *Sutherland*
and settled a claim of such a serious nature in the manner
in which the settlement was made, without an effort to take
counsel in respect to it, is a very strong circumstance tend-
ing to show that he was of that mental make-up liable to
be controlled and moved to action, to his disadvantage, by
fear.

Looking to the direct evidence of what occurred, that of
respondent and *Langdon* in regard to the threats made when
the papers were served is in direct conflict. The probabili-
ties, however, are in favor of the former. That of *Langdon*
and *Sutherland* as to what occurred at *Sutherland's* office is
in direct conflict with that of respondent; but the probabili-
ties are rather in favor of the truth of the material part of
the respondent's story, to the effect that he was actually
threatened with arrest and imprisonment unless he made
the settlement demanded, and was told and made to believe
that the offense alleged against him was one that might sub-
ject him to arrest and punishment by a long term of con-
finement in state prison.

We have not overlooked any of the evidence bearing on
the question under consideration. It has all been read with
care. Respondent may be mistaken as to having been
locked in a room with *Sutherland*, but there is no dispute
but that he was taken into *Sutherland's* private room where
what was said between the two could not readily be heard
by persons in the general office if the door between the two
rooms was closed; and there is evidence independent of re-
spondent's testimony, showing that such was its condition
at least part of the time. It may be that *Sutherland* did
not use profane language in threatening respondent, and
that when the former went into the main office after the

settlement agreed upon the persons there did not observe
in him any appearance of excitement, yet it be true that he
threatened the respondent with arrest and imprisonment,
and produced in his mind a conviction that such would be
the result of a refusal to speedily settle the claim, and that
he was thereby rendered incapable of exercising his judg-
ment in respect to complying, or refusing to comply, with
the demand made upon him; and that in taking the latter
course he merely carried out *Sutherland's* will instead of
his own. As we view the record, the issue as to whether
the threats were made as claimed turns on the evidence of
respondent on the one side, and *Sutherland* and *Langdon*,
considered practically as one person, on the other, and the
circumstances characterizing the whole transaction. The
unnaturalness of the occurrence of giving the note and mort-
gage, under all the circumstances, except as explained by
mental weakness on the part of respondent and fear of pun-
ishment as a criminal if he did not settle the claim made
upon him, is such that in view of the corroborating evidence
we cannot say but that the trial court's determination, that
respondent's story is in the main true, is correct. There is
evidence to the effect that the attorney declared, to persons
who partook of the alleged impure meat with *Sherman*, that
he had scared respondent into a settlement of the *Sherman*
claim, for the purpose of inducing them to make a like claim.
That evidence is disputed, it is true, but it cannot be ignored.
There is also the circumstance of the attorney and his alleged
confederate arming themselves with a written direction
from respondent for his wife to sign the papers, and their
going to his farm immediately after he executed such papers
to obtain her signature thereto in the absence of her hus-
band. It undoubtedly appeared to the trial court that if
respondent had been anxious to make the settlement, as ap-
pellants claim, and acted of his own free will, he would
have taken the attorney to his home to obtain her signature
to the papers in his presence, or would have procured her

presence at the attorney's office; and that no unusual or
hasty method would have been resorted to for the purpose
of obtaining such signature. There are many other circum-
stances to which special reference has not been made, that
throw some light on the transactions under consideration,
but further discussion of the evidence is unnecessary. We
are unable to say that the trial court was not justified in
saying that the charge of duress was established by clear
and satisfactory evidence. True, in a case of this kind the
facts essential to the cause of action must be established by
a greater degree of certainty than in a case where fraud is
not the foundation of the cause of action; but when a trial
court says that the requisite certainty is established by the
evidence, that decision must prevail on appeal unless clearly
wrong.

The finding of fact to the effect that appellant *Scallon*
and his assignor are each chargeable with notice of the man-
ner in which the note and mortgage were obtained from re-
spondent, cannot be disturbed. It is not deemed necessary
or advisable to discuss the evidence in regard to it. There
are many circumstances shown tending to prove that the
transfer of the securities was made, first to *Sutherland* and
then to *Scallon*, in order to avoid the very attack made upon
them by the bringing of this action. Moreover, as respond-
ents' counsel contends, since the note was payable to *Sher-
man's* order and was not indorsed by him to *Sutherland* or
by *Sutherland* to *Scallon*, the latter cannot claim the pro-
tection of the law merchant. He stands in precisely the
same position as *Sherman* did, the note being subject to all
the equities of the respondent the same as if no transfer of
it had taken place. *Terry v. Allis*, 16 Wis. 478; *Howard v.
Boorman*, 17 Wis. 459; Daniel, Neg. Inst. § 741, and cases
cited.

*By the Court.*— The judgment of the circuit court is af-
firmed.