CLEMENT *v.* BUCKLEY MERCANTILE CO.

1. DURESS—CONTRACTS—THREATS OF PROSECUTION.
    Although contracts entered into under duress are voidable, the law does not recognize duress from mere suggestion, advice, or persuasion between parties dealing at arm's length.

2. SAME.
    It is necessary, in order to constitute duress, that the party coerced was so intimidated and influenced by the threats, if no actual violence, imprisonment, or force is charged, that he ceased to be a free moral agent and became incapacitated from exercising his free will power in the matter or contract under consideration.

3. SAME—QUESTIONS OF LAW AND FACT.
    What constitutes duress is a question of law: whether duress appears in the particular case is usually one of fact.

4. SAME—EMBEZZLEMENT—COMPROMISE AND SETTLEMENT.
    In a suit to set aside a transfer of property made by complainant and his wife, under alleged threats of a prosecution for embezzlement, in settlement of a claim made against him by

his employer, the question of duress was not necessarily contingent upon complainant's guilt or innocence.

5. SAME.

Evidence that complainant was an experienced man of affairs, that he was familiar with defendant's manner of conducting its business and with its books, of which he had charge during his employment, that he settled the claim of shortage by transferring property to defendant, including his homestead, and although the question of threatened prosecution was in dispute, that complainant was induced by defendant's officers to make the compromise, as against denials by the authorized agents of defendant that they made any such threats, was insufficient to sustain the burden of proof resting on complainant.

6. SAME.

As a rule duress cannot prevail to invalidate a contract entered into with full knowledge of all the facts, with ample time for investigation and opportunity for consideration, consultation, and reflection.

7. SAME—HOMESTEAD—SETTING ASIDE TRANSFER—WANT OF CONSIDERATION—HUSBAND AND WIFE.

But as to the wife who signed a conveyance of the joint homestead to avoid a prosecution of her husband, who also transferred to defendant enough personal property owned by himself to cover any shortage that the evidence disclosed to have existed, the court of equity has power to grant relief and set aside the deed for want of consideration.

Appeal from Wexford; Lamb, J.   Submitted June 17, 1912.   (Docket No. 117.)   Decided October 2, 1912.

Bill by George M. D. Clement and Mildred Clement against the Buckley Mercantile Company to set aside a compromise and certain conveyances made in furtherance thereof.   From a decree for complainants, defendant appeals.   Modified and affirmed.

*J. W. Patchin* and *Wetmore & Breen*, for complainants.

*Pratt & Davis* and *Gaffney & Miltner*, for defendant.

STEERE, J.   This is an appeal from a decree of the

Wexford county circuit court, in chancery, requiring defendant to return certain money, retransfer certain stock, and reconvey certain real estate, previously paid, transferred and conveyed to defendant by complainants in settlement of an alleged shortage of complainant George Clement, while in defendant's employ. Complainants' claim of right to such decree is based upon the charge that they were induced and impelled to make over said property to defendant through fraud and misrepresentation as to the amount of such alleged shortage and threats of criminal prosecution against complainant George Clement for embezzlement; also, that, as to complainant Mildred Clement, who joined in a conveyance of their homestead, there was absolutely no consideration.

Defendant, the Buckley Mercantile Company, is a corporation organized in October, 1908, with a capital stock of $20,000, engaged in general mercantile business at the village of Buckley, in Wexford county. Complainant George Clement participated in its organization. He was awarded 50 shares, $500 worth, of its capital stock, and entered its employ, being elected a director and secretary of the corporation. He was experienced in mercantile business and bookkeeping, had resided in Buckley for some years, where he had a general acquaintance, was on friendly terms with the members of the new organization, and was regarded as a desirable person to be actively employed by the organization. He did not pay for his stock at the time of taking it, but the necessary funds to purchase it were advanced to him by Glen A. Brigham, one of the principal stockholders, whom he was to repay within a year. He made the repayment at the end of 18 months. The directors elected at the time of organization were said Brigham, Carl S. East, Wilbur Earl, and said Clement, who continued in office up to the time Clement ceased his connection with the concern. East was chosen president and general manager, being also in active employ of the company. Clement, a secretary and bookkeeper, was put in charge of the books, accounts, and

office work in general.   Both of them went upon the floor
with the clerks, acting as salesmen when time from other
duties permitted and business demanded.

According to the by-laws of the corporation, Clement's
duties as secretary were to make reports to the directors
and stockholders, issue notices, and keep minutes of meet-
ings, and to countersign all certificates, contracts, checks,
and other papers and instruments of the company.   A
treasurer was elected, as provided for in the by-laws, but
does not appear to have performed the duties of such office,
which were attended to for the most part in the office at
the store by Clement, or under his direction.   He was in
charge of the cash, signed checks, kept the books, and
looked after the accounts and business details of the con-
cern.   Defendant began business October 17, 1908.   The
following December a "cash carrier system" was in-
stalled and maintained until July 1, 1910, when it was
abandoned, and replaced by a cash register.   While the
cash carrier system was used, a cashier's desk was located
in the office at the rear of the store, where a cashier was
stationed to attend to the business as it was sent in over
the carriers from the clerks on the floor.   Slips were used
by the clerks, on which business transactions with cus-
tomers were minuted and transmitted, together with any
money received, to the cashier, who took the slips and
money from the carriers, made change when required,
looking after the cash, and preserving the slips during
business hours.   Four kinds of slips were used, indicating
different transactions, known as "cash sales," "charge
sales," "cash paid out," and "credit slips."   The cashier
had separate spindles on which to put the slips of each
clerk.   These slips were furnished in pads of 50, each slip
being numbered, running from 1 to 50 on each pad.   The
pads were issued to the clerks as needed.   They could be,
and were supposed to be, made in duplicate when the
business minuted on them was transacted; a carbon copy
being given to the customer.   These slips, so made out,
were the first and original records of the business.   At

the close of each day, the sorted slips would be gone over in the office, the cash counted and the day's business figured up, balanced when possible, and eventually entered on the books. The cashier usually arranged and classified the slips, and footed up the cash sales the same evening, or the next morning.

Clement was usually the first one at the store in the morning, and it was his custom to then make a computation of the previous day's business, count the cash, and put figures on a slip of paper, showing cash on hand, less items of cash paid out and change placed in the cashier's drawer, and then attach this memorandum to the cash carrier slips of the day, which were subsequently laid away. Discrepancies between the cash received and the records were of common occurrence, and frequent errors arose, which were a topic of general discussion in the office. Clement was the responsible party in charge of the cash and books. He admits that such errors and discrepancies developed and continued, but attributes them to conditions existing in the store and the system of doing business; points out that different persons were employed as cashiers, some with and some without previous experience; that the safe containing the money, except that carried in the cashier's till to make change, was left open during the day; that at times, when the cashier was absent, the clerks went to the desk and made their own change; that some of the slips issued to the clerks were never returned to the cashier's desk, and no account was kept of those missing, without which a complete check on the business was impossible. It is contended in his behalf that, with the methods followed, it would be at least equally probable that some one else was, or might have been, responsible for any shortage which arose. The testimony as to the manner in which business was conducted is voluminous. Without going into further details on that branch of the case, it can fairly be said that, under the system adopted, and method of executing it, discrepancies naturally arose, and opportunities for leaks,

difficult of detection, developed.   Though Clement was in authority and had charge of these matters, he offers no testimony imputing dishonesty to, or raising suspicion against, any other employé.

Whether well founded or not, certain things done by Clement, and reports of goods taken from the store, and money received by him for the store of which they found no record in the books, resulted in other officers of the corporation becoming suspicious of him.   They finally called a meeting on August 2, 1910, when he was told of their lack of confidence in his integrity, and asked to resign.   Conditions and reasons were discussed with him, and he was told of certain things which were unsatisfactory and had aroused suspicion.   He gave his explanation of such matters and protested his innocence, but stated he was willing to resign, and did so.   He asserted his books were correct, and cash would balance within $2 or $3.   It was proposed that his books be audited.   He testified that he demanded that they be audited, offering to pay part of the expense of so doing.   Others present at the meeting testified that, when the subject was broached, he asserted the books were right, and it was foolish to install a new set or to have his audited.   It was subsequently decided to have an audit of the books and accounts.   The Michigan Audit & Appraisal Company, of Grand Rapids, was engaged for that purpose.   A representative of said company visited Buckley, and conferred with the directors, after which an inventory of stock was taken, and an accountant named Hardman put at work on the books and records.   Clement had expressed a desire to be present when the books were audited.   He was notified when the auditing began, and invited to participate, but paid but little attention, and spent but little time there, though several times sent for and requested to be present.   Hardman, after going over the cash book, ledger, and day book, proceeded to take up the cash slips.   He found them, or part of them, upstairs in a large box, mostly in loose order. Those for June, 1910, were together, with a string around

them, each day's slips intact.   He also sorted out all of
the May slips he could find, and proceeded to make a
"reconcilement" of those two months.   He testified that
he discovered, as the work progressed, discrepancies, ir-
regularities, and shortage.   When satisfied that his work
up to that point had clearly developed such a result, he
talked with certain of the directors, and reported what he
had found.   He never resumed or completed the audit, ow-
ing to the fact that the alleged shortage was settled by a
transfer to defendant of property, to regain which this suit
was brought.

Testimony given by the respective parties as to the cir-
cumstances and causes of such settlement and transfer is
widely at variance.   Clement testified that, subsequent to
resigning his position with the company, he was visited
by Hardman, who told him that the books and slips
showed a shortage for which Clement was responsible,
and asked, "What kind of a proposition have you got
to make—to offer?" stating that he had gone over the
slips for May and June, and found a shortage of $450 or
$500 for those two months, also an estimated shortage of
$2,000 in the accounts, and that the inventory showed a
loss of about $1,500.   Clement further testified that he
denied this, and told Hardman he was a liar, or the slips
had been tampered with, because he knew the slips did
not show any such an amount of shortage, and Hardman
replied that it took only $25 to make an embezzlement
case; that he had talked with Brigham, who was deter-
mined to "shove him (Clement) over the road," and had
called up attorneys in Traverse City to start proceedings;
that, protesting his innocence, but impressed by Hard-
man's statements as above given, and further talk of like
import, coupled with assurances of friendship on Hard-
man's part and desire to help him, Clement yielded and
said he would see what he could do; that, after talking
over the proposition, they finally arranged that Clement
would see East and Earl about the matter, and Hardman
would also interview them in Clement's behalf, and try

to persuade them to intercede with Brigham; that Clement told his wife that evening of Hardman's visit and. what he said; that both of them were greatly distressed and worried; that he saw East and Earl, as proposed, who seemed quite friendly and promised to see Brigham for him. Of this interview he testifies in part:

"In speaking about the shortage in the slips, as I told them at that time, I wasn't guilty, but I couldn't deny what Hardman had told me—that there was the slips. I had counted up the money in the mornings. There was the cash slips filed away every one, and I knew that they showed a discrepancy of a small amount, in the course of that time, would doubtless show more than $25, and I believe so yet, but I said: 'I am fast according to Hardman's statement, although I am not. guilty. I will turn over everything I have rather than take a trip over the road,' and I named to them what property I had at that time, and also made the statement to them that I believed that 'murder will out,' and that, although I felt I was fast at that time, that I believed the guilty man would be found later."

He further testified that Hardman also saw Mrs. Clement, and told her substantially the same story, relative to a shortage and threatened criminal prosecution, which he had told Clement; that, as a result of the various interviews, he met Brigham, East, and Earl the next day, and agreed with them on a settlement, under which he and his wife conveyed their homestead, consisting of a house and two lots, to defendant, and he paid defendant $300 in money and assigned to it his stock in said corporation.

Brigham, East, Earl, and Hardman all positively denied that there was any misrepresentation, attempt at intimidation, or threats of legal proceedings, civil or criminal, to induce a settlement. They testified that while the investigation and audit of the books was in progress, Clement was several times asked to be present and participate; that once or twice when requested to come and explain certain matters he did so, but remained but a short time; that, after the slips had been gone over for the two months, he

was requested to meet with Hardman and investigate; that he promised to meet him at the store for that purpose, but failed to keep his promise.   Hardman testified that, when Clement failed to meet him at the store, he thought it but fair to tell him what the books and records seemed to disclose; that he accordingly went to him and had an interview, informing him of the apparent shortage, and again asked him to go to the store and go over the matter himself, which he declined to do; that Hardman made no threats or suggestion of legal proceedings, but insisted that the records showed a shortage; that Clement first broached the subject of embezzlement, and asked Hardman if they could arrest him on a criminal charge, to which Hardman replied he thought they could; that, after some further talk as to the nature of the amount of the shortage, Clement himself asked if the matter could be settled, and Hardman expressed the opinion that it might, although he had no authority to say; that he did not tell him that Brigham was proposing to shove him over the road, or had sent to attorneys to begin proceedings; that, at Clement's request, he subsequently talked with officers of the company favorable to a settlement of the matter, and at a later time, when looking for Clement, he met the latter's wife, who asked him about the trouble, and he told her of what he had found.   East, Earl, and Brigham testified that Hardman had no instructions or authority from them to propose a settlement or to make any threats, or offer any inducements to that end; that Clement came to them voluntarily, so far as they knew, and proposed to settle up his shortage, stating that, if they had found the slips, it was all off with him, and he might as well settle it up; that none of them knew or claimed to know the amount of his shortage, and so told him; that the settlement was made on his proposition and statement of what he was willing to do, even less being accepted than he at one time offered.   Earl, who was instrumental in getting a position for Clement with the company and states they had been friends from boyhood, testifies:

" I know that we talked the matter over that night, and I know that Mr. Clement rather, in a way, wilted when the matter of the slips was broached to him. We went home together, and I saw him the next Friday night. He had been at the store and inquired for me, so they told me, and from there he caught up with me in front of the barber shop, and asked me where I was going, and I told him I was going to the barn. He said, ' I will go over with you,' and he did so, and he told me that Mr. Hardman had been out to see him, and he said, ' Will, I am up against a proposition. They have me. There is no use for me to deny this whatever, because,' he says, ' you have proof for it.' And he wanted to settle it up, and he begged me that night to do all I could to help him to settle it up, and while we were talking Mr. East came from supper, and was going by, and he hollered for Mr. East to come over there, and he repeated the same words several times that night—that there was no use for him to deny it because he was caught, and asked Mr. East and me to go to Brigham and see what he thought about it. I made the remark to Clement that he knew better than we how much he had taken, and not to make a proposition to pay back more than he honestly thought he had taken, and left it to him to make the proposition as to what he wanted to turn over, to make good, and it was left in that way. To that he made the proposition that he would turn over his house and lot, his $500 worth of shares of stock in the company and he said he had $500 in the bank. I repeated to him several times, and said to him: ' Now, George, don't pay back $1 more than you honestly think you have taken.' And Mr. East said to him right there: ' George, I would rather lose $500 of my own money than to think I had taken a dollar from you that belonged to you.' And he asked us, begged us to go and see Mr. Brigham, and see what we could do about it."

The record as a whole leads inevitably to the conclusion that the investigation which was going on, and what was said and done in that connection, exercised a quickening influence on complainants, and resulted in their reaching a frame of mind where a settlement was desired. Was what was said and done adequate to deprive them of their free will so that their acts in settling were not of their

own normal volition? To constitute duress such must have been the case.

The law does not recognize duress by mere suggestion, advice, or persuasion, especially where the parties are at arm's length and represent opposing interests. 9 Cyc. p. 443. That a contract, entered into under duress is voidable at the instance of the party so constrained, is unquestionable.

There is no proof here, or even charge, of imprisonment, arrest, physical force, or violence. The only duress claimed is *per minas*—by threats and intimidation. To constitute this, it must appear that the party coerced was so intimidated and moved by the threats made as to cease to be a free moral agent, and became so bereft of those qualities of the mind essential to entering into a contract as to be incapacitated to exercise his free will power in that connection.

"As said in *Wolff* v. *Bluhm,* 95 Wis. 257 (70 N. W. 73, 60 Am. St. Rep. 115), the condition of mind of a person produced by threats of some kind, rendering him incapable of exercising his free will, is what constitutes duress. The means used to produce that condition, the age, sex, and mental characteristics of the alleged injured party, are all evidentiary, merely, of the ultimate fact in issue, of whether such person was bereft of the free exercise of his will power." *Galusha* v. *Sherman,* 105 Wis. 263 (81 N. W. 495, 47 L. R. A. 417).

While what constitutes duress is a question of law, whether duress exists in a particular case is a question of fact. *Galusha* v. *Sherman, supra.*

It was the opinion of the learned circuit judge that—

"To sustain the transfer of the property in question, it should be made to appear from the proofs that the complainant, George M. D. Clement, is not only guilty of the crime of embezzlement, but also that the amount embezzled is approximately the value of the property transferred by way of settlement."

We do not think this case turns on the question of whether Clement would, or should, be convicted of embez-

zlement, if criminally prosecuted. The questions raised by the pleadings and proofs are duress, fraud, and want of consideration. These are not necessarily contingent on his being guilty of crime.

Clement himself does not testify that either East, Earl, or Brigham made threats of prosecution. They severally deny doing so, or authorizing it to be done. He does not deny that he first made overtures of settlement to them. He admits that he was invited to examine the books and investigate for himself. When the delinquencies testified to were called to his attention and he was asked to explain, and threatened with prosecution, as he testified, the investigation was in progress, and not completed. It can be inferred that he should, and assumed that he would, know what the facts were, and what the ultimate result would be, better than Hardman or any other person. Whatever the cause, it is undisputed that he went to the officers of the company before the audit was concluded, and made a proposal of settlement which was accepted, and which resulted in discontinuance of the examination. He was a man of mature years, himself a bookkeeper, world wise, experienced in business matters and other activities involving responsibilities and dealings with men of various classes, had been in politics, running for and holding office, having at one time been president of the village in which he lived. It would seem more probable that such a man, with such knowledge and experience, if innocent, would not only have protested his innocence and given the lie to those charging him with crime, as Clement testified he did in this case, but would have absolutely refused any compromise, and insisted on further investigation and vindication. If it was true that the worst which could be shown was a bad system and loose business methods resulting in confusion and losses, or even careless bookkeeping, it would not be expected that an innocent man of his experience in dealing with men would become so terror-stricken as to be bereft of judgment and volition by the statements, or threats of another bookkeeper, having

manifestly much less knowledge of the books and business under discussion than himself. Assuming that he, the officers of the company, and Hardman are equally credible and equally interested witnesses, he has failed to establish his claim by a preponderance of evidence.

The burden of proving duress is upon him. So far as interest in this case is shown, his is apparently greater than theirs, and Hardman's the least.

As a rule, duress will not prevail to invalidate a contract entered into with full knowledge of all the facts, with ample time and opportunity for investigation, consideration, consultation, and reflection. Clement knew the facts in this case, was given ample opportunity, and invited, to investigate, and was free to consult with whomsoever he saw fit. We do not think the testimony, considered as a whole, sustains his claim of duress as to himself. It comes nearer to that point when applied to Mrs. Clement. As to her there are no considerations of *par delictum*. She, so far as shown, was an innocent party, ignorant of the true facts, and signed the deed of her home without any money consideration, through fear and anxiety for the safety of her husband, under circumstances which, to her, were at least tainted with veiled but implied threat of impending prosecution and disaster to him.

But, without determining the question of whether or not all the essentials of technical duress, as defined by the authorities, are clearly shown, there are equitable considerations that enter an adjudication of her rights.

"Courts of equity grant relief in many cases where there is no legal duress, in strict acceptation of the term, and where the wronged party would perhaps be remediless at the common law." *Meech* v. *Lee,* 82 Mich. 274 (46 N. W. 383).

The proofs in this case fail to show a shortage even remotely approximating the value of the property transferred upon the settlement. The only items in relation to which any substantial proof was introduced total $555.65. The property turned over by complainants is shown, with-

out controversy, to be worth $2,800. The homestead was valued at $2,000. The stock and money paid by George Clement more than covers any shortage of which there is any evidence, beyond mere suspicion, conjecture, and inference from his conduct, irrespective of whether they had brought pressure to bear and made threats or not, and assuming that when the settlement was made defendant's officers did not know the amount of the shortage, but accepted what Clement proposed, they nevertheless knew that he and his wife were actuated by fear of exposure and criminal prosecution, for they admit that he told them so.

It is urged that defendant, by consenting to a settlement and abandoning its investigation at the solicitation of Clement, lost the means of conclusively establishing his liability, and should not now be put to a disadvantage and compelled to sustain a loss as the result of such forbearance. So far as the testimony discloses, the books, slips, accounts, and other means of investigation possessed at the time of settlement are yet available; some of them were produced at the hearing. It does not appear that the condition of the parties has changed in that respect.

A conveyance of the homestead by the husband without the signature of the wife is void. The law preserves her rights in the homestead as absolutely as though she had full title to it. She owed defendant nothing. No losses are shown by reason of her husband's shortage which are not made good by the personal property he surrendered. Under such circumstances, her participation in a conveyance of the homestead was without legal consideration. As to her, the decree of the trial court, canceling the conveyance of the homestead, is affirmed. As to complainant George Clement, the decree is reversed and bill dismissed.

A decree may be prepared accordingly, without costs to either party.

MOORE, C. J., and McALVAY, BROOKE, STONE, OSTRANDER, and BIRD, JJ., concurred.