## ELLISON v. PINGREE et al.

No. 3901.   Decided December 13, 1924.   (231 Pac. 826.)

1.  CORPORATIONS—DURESS IN THE PROCURING OF CONTRACT HELD NOT
    |ESTABLISHED BY FACTS DETAILED.   Under facts, accepting state-
    ments of party seeking to avoid his contract with creditors
    of corporation, of which he was president and principal stock-
    holder, to deliver property to it to secure its creditors, *held*,
    that "duress," as understood and applied by the courts, was
    not established.

2.  CORPORATIONS—CONTRACT OF PRESIDENT AND PRINCIPAL STOCK-
    HOLDER WITH CORPORATION'S CREDITORS TO DELIVER PROPERTY TO
    IT HELD TO HAVE CONSIDERATION.   Contract of president and
    principal stockholder with creditors of corporation to deliver
    property to it, to secure them and preserve its business, *held*
    to have consideration.

Appeal from District Court, Second District, Weber
County; *J. N. Kimball*, Judge.

Action by Ephraim P. Ellison against James Pingree and
others.   From a judgment dismissing the cross-complaint of
the named defendant against the Ogden Packing & Provision
Company and other defendants, and in favor of said com-
pany on its counterclaim against said Pingree, Verdi L.
Pingree, his administrator, substituted in his stead, appeals.

AFFIRMED.

*Henderson & Johnson*, of Ogden, for appellant.

*Edward R. Johnston*, of Chicago, Ill., and *De Vine, Howell,
Stine & Gwilliam*, of Ogden, for respondents.

FRICK, J.

---

(1) 13 C. J. p. 396, § 310.

This action was commenced in the district court of Weber county, Utah, by Ephraim Ellison against all of the defendants named in the title.

The defendant, James Pingree, filed an answer to the complaint, and, in connection therewith, also filed a cross-complaint against all of the defendants. The Ogden Packing & Provision Company, hereinafter called company, filed a separate answer to the cross-complaint of James Pingree, and also set up two separate counterclaims as against him. There were also answers to the cross-complaint of James Pingree on the part of several of the other defendants, while some of the other defendants named in the title were not served with process and made no appearance in the action. James Pingree replied to the counterclaims set up against him.

When the action was called for trial the plaintiff Ellison dismissed his complaint as against all of the defendants and the action proceeded upon James Pingree's cross-complaint and the answer and counterclaims referred to, and the answers of the other answering defendants. Before the trial the cross-complaint of James Pingree was also dismissed as against all of the defendants except the company, and the action proceeded as between James Pingree and the company only.

In view of the great length of the pleadings we cannot state them even in substance. It must suffice to say that the gist of the cross-complaint of James Pingree is to the effect that certain contracts entered into and delivered by him, by the terms of which he had parted with a large amount of personal property consisting of notes, bonds, and stocks of the value of $250,000 to the company to secure its creditors, were obtained, and that said property was delivered under duress, and hence he sought to recover back said property or its value from the company. During the trial the court also dismissed the second counterclaim of the company.

When James Pingree rested his case, the court, on motion of the company, dismissed his cross-complaint and entered judgment upon its first counterclaim against him. After the action had proceeded to judgment Mr. Pingree died and his

administrator, Verdi L. Pingree, was substituted in his stead.
The administrator subsequently appealed from the judgment
entered in favor of the company upon its first counterclaim.
The counterclaim of the company was based upon one of the
notes that had been obtained by it by virtue of the contracts
hereinafter referred to, and which note had not been paid
by James Pingree.

The undisputed facts, stating them as briefly as possible,
are to the effect that by reason of great losses in business
which the company had sustained during the preceding year,
amounting to over $600,000, it was unable to meet its current
obligations as they matured. Immediately upon receiving the
report, Mr. Pingree, as the president and treasurer of the
company, notified the defendants A. G. Becker and the Con-
tinental & Commercial National Bank, both of Chicago, Ill.,
who were the principal creditors of the company, and to
whom it was indebted in very large amounts, of its inability
to meet its current obligations. Upon the receipt of such
notice, the defendant C. H. Poppenhusen, as the representa-
tive and attorney for A. G. Becker, and the defendant Carey
W. Rhodes, as the representative and attorney for the Conti-
nental & Commercial National Bank, both of whom were
lawyers, immediately came to Ogden, Utah, from Chicago for
the purpose of investigating the financial condition and af-
fairs of the company. On arriving at Ogden they immedi-
ately went to Mr. Pingree at his bank as the president and
treasurer of the company. Mr. Pingree at the time was also
the principal stockholder of the company. He, according to
his testimony, then owned 1,600 shares of its capital stock,
while the James Pingree Company, a holding company com-
posed of himself and members of his family (he being the
principal stockholder), owned 2,000 shares of the stock, mak-
ing a total of 3,600 shares owned by Mr. Pingree and his
family. Mr. Pingree admitted while testifying that he owned
"nearly $500,000 worth of the company's stock."

After Mr. Poppenhusen and Mr. Rhodes had discussed the
affairs of the company with Mr. Pingree and other directors
and stockholders, they called in an auditor to assist them in

arriving at the financial condition of the company. Much discussion ensued, and Mr. Poppenhusen and Mr. Rhodes insisted that Mr. Pingree, as the principal stockholder of the company, and as its president and treasurer, should assist the company in its then financial predicament. Mr. Pingree demurred and suggested that a receiver be appointed for the company. Poppenhusen and Rhodes opposed the appointment of a receiver and agreed that their clients would furnish sufficient funds to take care of the drafts drawn on the company, but they strenuously insisted that Mr. Pingree should advance large sums of money or give secured paper so that the company's credit could be maintained. Mr. Pingree refused to accede to their demands and much discussion followed, in the course of which both Mr. Poppenhusen and Mr. Rhodes seriously criticized Mr. Pingree's acts in conducting the business affairs of the company. They finally demanded that Mr. Pingree should advance to the company $500,000. In connection with their demands they also insisted that he had been guilty of sending false statements through the mails upon which their clients relied and had advanced money; that he, as president of the company, had authorized large dividends, and as treasurer had paid them, and as stockholder had received both cash and stock dividends when he knew the company had not earned any profits with which to pay the dividends, and, further, that he had paid to his bank large sums of money and thereby had preferred his bank, etc. Mr. Pingree denied those statements, whereupon, he says, both Mr. Poppenhusen and Mr. Rhodes threatened that unless he acceded to their terms they would institute criminal proceedings against him and would "send him to the penitentiary at Leavenworth" upon the charge that he had violated the United States postal laws. They also insisted that they would compel him to repay the unearned dividends, etc. After some weeks of discussion, in which there was much crimination and recrimination, during all of which time Mr. Pingree was represented by and consulted with counsel and with his friends, he finally, on March 16, 1920, signed a contract, which, however, was dated as of the

2d day of that month, by the terms of which he agreed to de-
liver to the company his secured promissory notes amounting
to $325,000 and his unsecured promissory note for $100,000,
all payable some time in the future, and further agreed to
pay within 45 days certain notes aggregating in amount
$82,823.30. Under the contract he was to receive from the
company what is called class B preferred stock, amounting to
the par value of $425,000, which stock was to be subject to
$1,000,000 worth of class A preferred stock, which latter
stock was to be sold and the proceeds thereof paid into the
treasury of the company.

With matters in that condition, Mr. Poppenhusen and Mr.
Rhodes returned to Chicago. Nothing was done by Mr. Pin-
gree, however, in carrying out the terms of that contract.
Later, about May 1, 1920, he again took up the matter with
Mr. James H. De Vine, the attorney for the company, and
suggested to the latter that he desired to make some modifica-
tions in the existing contract. Mr. De Vine agreed to, and
did, take up the suggested modifications with the Chicago
people, after which both Mr. Poppenhusen and Mr. Rhodes
again came to Ogden. They both were very much opposed to
the modifications suggested by Mr. Pingree, and again much
discussion ensued. Mr. Pingree insists that the two again
reiterated their threats to prosecute him criminally and to
send him to the penitentiary at Leavenworth. After several
weeks more of discussion, and after again consulting with
his counsel, and after the latter had suggested material modi-
fications in the terms of the proposed new contract, Mr.
Pingree, in June, 1920, finally signed that contract, which, in
his cross-complaint, he alleges was obtained under duress the
same as the one he had signed in the preceding March. By
the terms of the last contract Mr. Pingree agreed to pay to
the company the sum of $250,000 by transferring and deliver-
ing to it certain promissory notes, stocks, and deeds to real
estate aggregating in value said sum of $250,000. By the
terms of the last contract Mr. Pingree was released from the
payment of the secured and unsecured notes amounting to
the sum of $425,000, all of which were returned to him, and

was also released from the obligation to take and pay for the $425,000 worth of class B ostck.

In addition to the foregoing, the time of payment of a certain note of Pingree's on which there was a balance due of $26,500, with interest, was extended for 90 days, and the other securities which he had delivered to the company under the March agreement were returned to him. The last contract concluded with the statement that the same was "intended as a compromise settlement and shall be accepted * * * in full settlement of all obligations under the said agreement of March 2, 1920"—that is, the agreement signed on March 16, 1920. In connection with the foregoing, in fairness to counsel who advised and consulted with Mr. Pingree during all of the negotiations referred to, it should be said that, in suggesting and in making the alterations and modifications of the two contracts, counsel did so only for the purpose of obtaining the best possible terms for Mr. Pingree, and after the modifications were made he did, nevertheless, advise Mr. Pingree not to sign them. Mr. Pingree, in his testimony, stated that his counsel advised him not to do so, and the only excuse he offered for signing the contracts was that he had a right to do so if he wanted to. It should also be stated that both Mr. Poppenhusen and Mr. Rhodes strenuously objected to granting Mr. Pingree more lenient terms than those that were contained in the first contract, and objected to the second contract. Their objections were, however, overruled by the other creditors, and the last contract was finally accepted. Nothing was done under the contract, however, by Mr. Pingree, and matters remained in status quo until March 14, 1921, when Mr. Ellison commenced this action in which Mr. Pingree filed his cross-complaint to recover back his property or its value, for the reason that the contracts referred to herein were entered into and the property was obtained from him by means of duress, etc.

Upon substantially the foregoing facts the district court held that Mr. Pingree had failed to make a prima facie case of duress, and hence dismissed his cross-complaint. The ad-

ministrator assigns a number of errors. We shall consider those that are argued in his counsel's brief.

In view that we have been compelled to greatly condense the statement of facts, it is only fair to state the contention of the administrator in the language of his counsel, as the same appears in their brief, to wit:

"During the months of January, February, March, April and May, 1920, and for a long time prior thereto, James Pingree was president and a director of the Pingree National Bank of Ogden, the National City Bank of Salt Lake City, First National Bank of Preston, Commercial National Bank of Smithfield, First National Bank of Layton, the Stock Growers' Bank of Evanston, Wyo., and was a stockholder in the Uinta County State Bank. These different banks had about fifteen thousand depositors and about thirteen or fourteen millions of dollars on deposit. At this same time Mr. James Pingree was also presiden and a director of the Ogden Packing & Provision Company, Pingree Sugar Company, Pingree-Idaho Sugar Company and a director of the Layton Sugar Company, and he also was a stockholder in the Guardian Fire Insurance Company of Salt Lake City. Besides, he was connected with numerous other corporations. The Pingree Sugar Company had a capitalization of two and a half million dollars and the Pingree-Idaho Sugar Company a capitalization of one million dollars. During the months of February and March, 1920, he was indebted between three and four hundred thousand dollars, which was about to mature. * * * In presenting this case to this court we will not contend that Mr. Pingree, during the time of the transactions complained of, was either non compos mentis, or weak minded. Neither shall we take the position that at the time the contracts were signed he did not understand their import, but we shall contend, first, that at the time he signed these contracts he was so environed, so circumstanced in financial matters that he was compelled, on account of the threats that were made against him, to sign the contracts in controversy, and that if it had not been for this environment and these threats he never would have signed them. Again, we shall contend that the May contract, being the last contract signed, has no consideration for the same, and if there is any consideration that it is so inadequate that to enforce it would do violence to the conscience of a court of equity. We say that in the spring of 1920 James Pingree's financial position was such that the threats that were made against him were a species of blackmail."

In our judgment the district court was clearly right in holding that under Mr. Pingree's own statements he utterly

failed to establish duress as that term is understood and applied by the courts. In his testimony he asserted over and over again that, stating it in his own language, "it wasn't fear of him (Poppenhusen) sending me to the penitentiary" that induced him to enter into the contracts or either of them, and that he was "not scared" of Mr. Poppenhusen. This statement is made so often, and in so many ways, that there is absolutely no room for doubt that it was not fear of imprisonment or loss of liberty, or of any personal injury, violence, or harm that induced Mr. Pingree to sign the contracts. He, however, said that what he was afraid of was that complaints against him might affect his credit and might hurt the credit of the institutions with which he was connected, namely, the various banks. A careful reading of all of Mr. Pingree's testimony, however, discloses that even the latter fear was largely an after thought. True it is he had large and varied business interests, and, as a matter of course, the inability to meet business obligations as they mature may, and frequently does, affect one's credit. A careful reading of his whole testimony, when considered in connection with the prevailing circumstances, however, shows that Mr. Pingree hesitated to act for the reason that he was unable to determine whether it was best to preserve his interests in the company, or to sacrifice them for his other interests.

To the mind of the writer Mr. Pingree finally entered into the contract because he thought that under all the circumstances what he did was what he ought to do, and in the hope that the company's large business interests might in that way be preserved and protected. In his testimony, again giving his own language, he repeatedly stated that it was his intention "to take care of the company and its interests, and finally, if we could not, to put it into the hands of a receiver." In view of all the circumstances, therefore, the statements of Mr. Pingree were the only logical and consistent statements he could have made. Moreover, all of the alleged threats were made when he was in his home city where he was born and lived all of his life, where he had been phenomenally successful in most of his business enterprises, where he had

amassed great wealth and was surrounded by many influential friends and business associates, where, during all of the discussions and negotiations leading up to the making of the contracts in question, he had the benefit of able counsel who had been his faithful legal adviser for about 25 years, and in whose judgment and ability he had implicit confidence. Moreover, he was a business man of great and varied experience and influence. Again, he himself in a large measure dictated the terms of the agreements, and especially the terms of the last one which was a "compromise and settlement" of the first one. In addition to all that he was largely benefited in being released from the terms of the first contract, which was accomplished by entering into the second one. Apart from the fact, therefore, that the second contract was in essence and effect a ratification and confirmation of the first one, under the undisputed facts and circumstances there was no duress in the sense that the term is used and understood. What constitutes duress is so well and so clearly stated in 13 C. J., p. 396, § 310, that we here reproduce and adopt the statement as the law upon the subject. It is there said:

"Duress is that degree of constraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or in apprehension to overcome the mind of a person of ordinary firmness. It consists not merely in the act of imprisonment or other hardship to which the party was subjected, but in the state of mind produced by those circumstances, and in which the act sought to be avoided was done. Of course, the agreement must have been entered into because of the imprisonment, or of fear of the threatened injury or imprisonment, otherwise there is no duress. Hence duress will not ordinarily invalidate a contract entered into after opportunity for deliberate action. Duress by mere advice, direction, influence, and persuasion is not recognized in law. Nor can a charge of legal duress be based on mere vexation and annoyance, mere pecuniary distress, a threat to injure one's credit, or the refusal to surrender property on which one has a lien."

In 9 R. C. L., under the title "Duress," § 7, p. 717, after a discussion of instances constituting duress, it is said:

"It is generally held, however, that the threat must be of such a nature and made under such circumstances as to constitute a

reasonable and adequate cause to control the will of the threatened person and must have that effect, and the act sought to be avoided must be performed by the person while in that condition; and that an act, such, for instance as the voluntary and free acknowledgment of a deed, subsequent to the time when the threats were employed, will not be considered as having been done under duress. If, however, the threats were long continued, and the act which it is sought to avoid was done such a short time thereafter as to indicate that the mind of the person was still under the influence of the threats, it has been held that this will constitute an act done under duress. The mere fact that a person is in fear of some impending peril or injury, or in a state of mental perturbation at the time of doing any act, is not sufficient ground for holding that the act was done under duress; nor can there be duress per minas from mere advice, direction, influence or persuasion."

In 1 Elliott on Contracts, § 144, p. 246, the author says:

"The general rule relative to involuntary payment is usually stated thus: 'To constitute coercion or duress which will be regarded as sufficient to make a payment involuntary, there must be some actual or threatened exercise of power possessed, or believed to be possessed, by the party exacting or receiving the payment over the person or property of another, from which the latter has no other means of immediate relief than by making the payment.' "

In 1 Page on Contracts, § 496, the law is stated thus:

"A person in his right mind and in full control of his faculties, who understands what he is doing and who has full power to enter into a legal transaction or to refuse to do so, does not act under duress if he enters into such transaction."

In *Morse* v. *Woodworth*, 155 Mass. 233, 27 N. E. 1010, 29 N. E. 525, the statement of the law is strictly in harmony with the texts we have quoted.

Counsel for the administrator, however, do not question the law as it is laid down in the foregoing authorities. Indeed, counsel, in their brief, say:

"We have not been able to find any case wherein the facts were the same as the case at bar, or anywhere near the same, but there are underlying principles in each of these cases which we think are applicable to the case at bar."

Counsel then cite the cases to which the foregoing statement refers. The principal case relied on is the case of *Clement* v. *Buckley Merc. Co.*, 172 Mich. 243, 137 N. W. 657.

A mere cursory reading of the opinion in that case, however, shows that the case is clearly distinguishable from the case at bar. Indeed, counsel, in their foregoing statement, impliedly, at least, concede that the case is distinguishable. In view that none of the other cases cited by counsel has any controlling influence upon the case at bar, we deem it unnecessary to refer to them further.

Counsel, however, insist that Pingree's contracts were without consideration. It would be a needless task to undertake to point out why the contention is untenable. The mere fact that Mr. Pingree not only had a pecuniary interest, but a very large pecuniary interest in maintaining the credit and integrity of the company, was one sufficient consideration for the contracts. But there are other circumstances. It was at least a disputed question whether he could or would not have been compelled to return for the benefit of the creditors the large dividends he had received from the company. According to Mr. Pingree's own statement, however, just before the first contract was entered into, the company had assets amounting to $3,060,000, with liabilities aggregating $1,650,000. According to Mr. Pingree, therefore, the assets exceeded liabilities to the amount of $1,410,-000. As the principal stockholder of the company, Mr. Pingree was therefore directly interested in preserving its business, and that is precisely what the principal creditors of the company likewise insisted upon. That is what they all sought to accomplish by what was done. Under such circumstances it is idle to insist that Mr. Pingree acted under duress or that his agreement lacked consideration.

In view of the conclusion reached it is not necessary for us to discuss the questions of ratification or of laches on the part of Mr. Pingree, in view of his acts and conduct after the contracts had been entered into. Nor is it necessary to refer to the judgment upon the first counterclaim. If Mr. Pingree's contract is legally enforceable it follows that the judgment on the counterclaim is clearly right.

The judgment is therefore affirmed, with costs.

WEBER, C. J., CHERRY, J., and McCREA, District Judge, concur.

GIDEON and THURMAN, JJ., did not participate in this decision.