Frank Tanner, Administrator, Appellant, v. William E. West.—
99 S. W. (2d) 7.

Division One, November 12, 1936.

*S. P. Reynolds, James S. Simrall* and *Walter J. Gresham* for appellant.

J. H. Hull, Lawson & Hale, Wm. B. Bostian, Charles W. German and R. R. Brewster for respondent.

FERGUSON, C.—In 1922, the defendant, West, was a State Bank Examiner and in that capacity made an examination of the Bank of Dearborn, at Dearborn, Missouri. He found a shortage in the accounts and assets of the bank. The bank was closed temporarily but later reorganized, reopened and continued in business under the same name. Henry C. Woodward, the original plaintiff, was a director and had been president of the bank for some four or five years consecutively prior to February, 1922, and thereafter continued as a director until the reorganization. That the bank might be reopened and to cover a certain shortage found by the defendant bank examiner, in March, 1922, Woodward and other directors executed their separate demand notes in proportional amounts which were placed in the assets of the bank. Woodward's note was in the amount of $17,000, of which $10,000 was on the shortage and $7000 to take up a note in that amount which he had previously made to the bank. Woodward secured the note, which was executed on March 16, 1922, by a deed of trust on approximately 160 acres of land in Platte County, Missouri. Later in May, 1922, Woodward paid and discharged this demand note and the deed of trust securing same by means of a loan in the amount

of $12,000 from an insurance company payable five years after date and secured by a first deed of trust on the land mentioned, certain credits allowed and a note to the bank for the balance, in the amount of $3400, secured by a second deed of trust on the same land. These two last-mentioned deeds of trust were foreclosed in 1927. Thereafter and on April 19, 1927, this action was originally commenced by Woodward in the Circuit Court of Platte County. Upon a change of venue to the Circuit Court of Clay County, plaintiff took a nonsuit on March 21, 1928. The present action was filed in the Circuit Court of Platte County on July 31, 1928. The case again went to the Circuit Court of Clay County on change of venue.

This is a tort action for damages. Plaintiff's petition charges that he and his wife executed all the notes and deeds of trust in 1922, which we have mentioned, under duress and "restraint of fear" caused by threats on the part of the defendant bank examiner "that unless he (plaintiff) made good the shortage . . . he (defendant) would have plaintiff arrested immediately on that day . . . and would call an officer and have plaintiff arrested for theft" that "by reason thereof plaintiff and his wife were" so "disturbed, distracted, overcome by fear" and "powerless" that the "signatures on said deeds of trust and notes were not the real signatures of plaintiff and his wife but merely perfunctory and compulsory," and that by reason of the alleged wrongful acts of the defendant bank examiner, West, plaintiff was "damaged." The prayer asks damages both actual and punitive. Upon a trial in the Circuit Court of Clay County, in December, 1930, plaintiff had a verdict for actual damages in the amount of $9000. The plaintiff Woodward died on April 27, 1932, and the cause was thereafter revived on April 6, 1933, in the name of Frank Tanner, administrator of the estate of H. C. Woodward, deceased. On March 17, 1934, the trial court sustained defendant's pending motion for a new trial and ordered a new trial on the ground of error in Instruction No. 1, given at request of plaintiff; whereupon plaintiff appealed. We shall herein refer to Woodward as plaintiff. Here appellant contends that plaintiff's Instruction 1, is correct both in substance and form and seeks a reversal of the trial court's order granting a new trial. Defendant counters first with the contention that plaintiff did not make a submissible case, that his demurrer to the evidence at the close of all the evidence in the case should have been sustained, and that the order granting a new trial should be upheld on that ground, assigned in his motion for a new trial. We shall therefore first examine this contention which requires a review of the evidence.

In making the statement which follows we set out only the undisputed facts and the facts shown by plaintiff's evidence In 1921 plaintiff was a director and president of the bank and had been continuously since some time in 1917. Ed C. Smith, W. P. Harrington,

Lewis C. Gabbert and W. H. Gabbert were also directors. W. P. Harrington was vice president and was employed in the bank. W. H. Gabbert was cashier and in active management of the bank. Lewis C. Gabbert was attorney for the bank and resided at St. Joseph, Missouri. All the witnesses referred to W. H. Gabbert as "Boge" Gabbert and we shall do likewise in the course of this statement. In August, 1921, one Lowery, a State Bank Examiner, made an examination of the bank and found that the bank was carrying among its assets $28,640 in bonds of an "Iron Company" or "Iron Foundry." These bonds were deemed of small or doubtful value and the requirement was made that they be removed from the assets of the bank and other acceptable assets substituted in lieu thereof. To meet this requirement four of the directors, Lewis C. Gabbert, Boge Gabbert, Smith and plaintiff Woodward took over the bonds and each gave the bank his promissory note in the amount of $7160. It appears from plaintiff's testimony and other evidence adduced by plaintiff that by the following January (1922), the bank was in bad condition which was known to the directors and stockholders. Plaintiff speaks of a "shortage" existing "then," "bad loans," and "bad management" and stated that at that time "we agreed among ourselves" to make an assessment of fifty per cent on the stock. It does not appear however whether or not this was done.

Some $40,000, or more, in government bonds, owned by numerous customers of the banks, had been left with, and were held by, the bank for safekeeping and the bank's receipts therefor issued. Plaintiff's witness, W. P. Harrington, vice president of the bank and employed in the bank, testified, that "in the summer or fall" of 1921, the cashier, Boge Gabbert took $5000 of the customers' bonds and sold them; that Boge Gabbert said he would use the proceeds from the sale of the bonds "for the purpose of restoring the legal reserve and that his brother Lewis Gabbert (director and attorney for the bank) had advised him to do that;" that when Boge Gabbert sold the $5000 in customers' bonds he entered up "fictitious accounts" on the bank's records; that "Mr. Woodward (president of the bank and plaintiff herein) came in in a few days and I called him off and told him that Gabbert had sold some of those bonds;" and that he "told Mr. Woodward all he had learned from Gabbert" about the sale of customers' bonds. Plaintiff admitted, that "in the fall or late in the summer," 1921, he learned that some of the customers' bonds had been "misappropriated;" that "Boge told me he had taken some of them and I said: 'You must put them right back and not take any more;'" and that "Billy Harrington called me into the bank and told me about it one day. Boge, I think, was present." Plaintiff admitted further that he "did not make any investigation to find out what the situation was;" that "he (Boge Gabbert) said he would pay it back

and make it all good . . . but I don't know whether he ever put much of it back. I think he said, after we found he had taken it" (plaintiff means when the matter was discovered and checked by defendant bank examiner in March, 1922) "that he had taken $40,000 (of customers' bonds) but had put back $10,000;" that subsequent to the time he received the information that customers' bonds were being sold and the proceeds therefrom placed in the assets of the bank he did not "bring the matter before the Board" or "discuss it with other directors;" that he thought all the directors knew it; and that "Boge and Harrington both knew it, and Lewis (Gabbert)" and "I thought Smith knew it." It appears, however, that the first information Smith had that the cashier had sold customers' bonds held by the bank for safekeeping was some time in January, 1922. Both plaintiff and Smith (a witness for plaintiff) relate the incident. Smith stated that, in January, 1922, "they said if we put up 50% of our stock the bank would go ahead so we (Smith and plaintiff Woodward) went over to Edgerton to make some arrangements to get some money but we didn't get it. As we came back Mr. Woodward says to me: 'Did you know Boge Gabbert sold some bonds out of the bank that didn't belong to the bank?' I says: 'No, I didn't know a thing about it.' " Smith further stated that he then talked to Boge Gabbert "about that" and Boge said: "I have paid them back." Neither plaintiff, Smith, nor any other director investigated the matter or made or required a check of the bonds or any accounting therefor. Smith was not re-elected a director at the annual stockholder's meeting the latter part of January, 1922. John S. Williams, James A. Drais and Ed. Skaggs, were new members of the board elected at that time and apparently the board was thereafter composed of Williams, Drais, Skaggs, plaintiff Woodward and Lewis C. Gabbert. Williams was elected president, succeeding plaintiff Woodward. It does not appear that either Woodward, Lewis C. Gabbert, Boge Gabbert, Smith, W. P. Harrington, or anyone having knowledge of the appropriation and sale of customers' bonds and the fictitious accounts informed the new members of the board of directors of that situation or any of the other stockholders.

In March, 1922, the State Bank Commissioner directed the defendant West, one of the State Bank Examiners, to make an examination of the Bank of Dearborn and on March 7, 1922, West commenced an examination of the bank. On the afternoon of the following day, March 8, West called a meeting of the board of directors, all the directors except Lewis C. Gabbert being present, and advised them that his examination of the bank disclosed "irregularities and considerable bad paper in the assets of the bank." The condition of the bank was discussed. The conclusion was that on account of bad, doubtful and excessive loans the capital stock ($25,000) was impaired. The total

amount of the "irregularities" and "bad paper" is stated at one place in the evidence as $65,000. The condition of the bank as ascertained by West and laid before the board did not include the customers' bonds which had been appropriated and sold and the proceeds placed in the assets of the bank. West had not discovered that nor did plaintiff, nor any of the persons having knowledge thereof, inform the bank examiner about the matter. The board was called to act upon the situation as shown by the statement before them and the bank examiner required as a condition to the bank remaining open that "the discrepancies and bad paper," which he had included in the statement submitted, be "made good." The board decided to call the stockholders together on the following day in a meeting at the office of Lewis C. Gabbert (director and attorney for the bank) at St. Joseph, Missouri. On that day March 9, 1922, all of the stockholders except two, "a Mrs. Turner who owned two shares and W. P. Harrington," attended the meeting at St. Joseph, held in the office of Lewis C. Gabbert. West was also present. The condition of the bank as shown by the statement compiled by the examiner West was again the basis of the discussion. As stated West at this time had no knowledge whatever of the appropriation, sale and manipulation of customers' bonds nor of the "fictitious accounts" set up nor was any information thereof given him at this meeting. Among the assets of the bank classed "doubtful" and "bad" and which the examiner required be "made good" were unsecured promissory notes of both Lewis C. Gabbert and Boge Gabbert aggregating a large amount. Lewis C. Gabbert proposed that he and his brother Boge would surrender all of their stock in the bank and turn over to the bank all of their property for the benefit of the bank and suggested that all the other stockholders surrender their shares of stock to the bank, that the entire capital stock be reissued and sold and that those who were able and desired to do so immediately subscribe for the number of the new shares of stock which they wished to purchase. West indicated that this plan would be acceptable and if carried out the the bank would be permitted to continue business. As the writer recalls the record subscriptions were received there and then for practically the whole proposed new issue of the capital stock. Neither of the Gabberts subscribed, Lewis stating that they were surrendering all their property and had no means with which to buy new stock. After the meeting or late in the course thereof West in some way had the intimation that there was a rediscounted note of Lewis C. Gabbert for $2000 at the Tootle-Lacy Bank of St. Joseph which was not shown on the statement and of which he had not had previous information. He asked Boge Gabbert to accompany him to the Tootle-Lacy Bank to investigate the matter. West verified that the bank held the $2000 note. He then asked Boge Gabbert "if that was all the irregularities

that was not shown in the statement.'' Gabbert replied that ''a few of the customers' Liberty Bonds had been sold  . . .  three or four or five thousand dollars'' worth. This was the first information West had of that matter.  He returned to the office of Lewis C. Gabbert and told those yet present there that ''it would be necessary to check the customers' bonds before any reorganization plan could be approved.'' The stockholders residing in Dearborn, and in that vicinity, returned to Dearborn on the interurban. West returned immediately to Dearborn with Drais, one of the then directors.  West went to the bank and told the assistant cashier what he had learned. ''The assistant cashier immediately turned to the various'' fictitious accounts ''in which the proceeds of the sale of these (customers')·bonds had been converted.'' In checking the customers' bonds with the assistant cashier it was found ''that something over $30,000 face value had been sold.'' Having investigated and verified this new development and ascertained the amount of the shortage caused thereby West requested that the directors be called together in a meeting that night. The directors and also Smith were called to meet at the bank.  West went to the home of director Drais and was his guest at a ''late supper.'' The plaintiff testified, that in response to the call for the meeting that night he went to the Drais home; that the meeting was held there; that the threats which he says West made, and which he claims dominated all his subsequent actions in the later execution of notes and deeds of trust during a period of many weeks depriving him of free agency and voluntary action, were made at the Drais home that night; and that he did not go to the bank that night or attend a meeting held at the bank that night.  All the other witnesses in the case both for plaintiff and defendant say the only meeting held that night at which the ''bond shortage'' was discussed was at the bank.  West says, two or three of the directors ''dropped in'' at the Drais home on the way to the bank; that Woodward was one of them; and that they went to the bank for the meeting.

We come now to plaintiff's testimony concerning the alleged threats which are relied upon to show such duress and ''restraint of fear'' imposed upon plaintiff as to deprive him of his free will, ''overcome'' him and render him ''powerless'' when six days later he executed the $17,000 demand note and deed of trust securing same and approximately two months later when he executed the five year, $12,000 note and deed of trust to the insurance company and the $3400 note and second deed of trust to the bank.  Woodward and Smith resided on their respective farms, four and one-half and six miles from Dearborn.  Plaintiff Woodward stated: ''They sent a car after us (Smith and himself)  . . .  the meeting was at a private house  . . .  the Drais house.  . . .  When I got there he (West) told me about finding that this money had been taken, the bonds, the $30,000, and

wanted to know if I knew anything about it and I said: 'yes, I had found it out,' and so on'' and that West then said: ''You are just as guilty as Boge Gabbert;'' that, ''I told him I wasn't, it was a lie. I didn't tell him a lie but I meant that;'' that West's statement ''made me mad'' and ''if I had had a good opportunity me or him would have scuffled in the dirt right there;'' and that Smith and directors, Williams, Skaggs and Drais were present at this meeting at the Drais home. The foregoing excerpt of plaintiff Woodward's testimony is taken from the cross-examination for the reason that he there for the first time explains his call to a meeting that night, the place of the meeting, those present, his arrival and where and when the purported threats relied upon were made. As stated Woodward on cross-examination said and reiterated that he did not attend a meeting at the bank on the night of March 9, and that the only meeting he did attend that night was held at the Drais home. While Woodward's testimony clearly discloses that the following events occurred the night of March 9, his direct testimony did not disclose where they occurred. As to the threats relied on his direct testimony is as follows: ''Q. Did he (West) talk with you about these bonds? A. Why, he was telling me about them, yes. Q. What was said when Mr. West talked to you about these bonds? A. He told me that these bonds had been taken and we would have to make them good, put them back. Q. Who do you mean by 'we'? A. Well the other directors of the bank—Ed Smith and Harrington and about all .. . . anyway we had to make it good or do worse. He gave us that to understand—we would be arrested. Q. Now, state a little more definitely and clearly what Mr. West said to you at that time? A. He said we was all guilty just the same and if we didn't make it good, why he was going to call an officer. Q. Now did you think he would call an officer? A. If a man threatens anything he's liable to do it. Q. Do you recall the deed of trust for $17,000? A. Yes, that came up later on. Q. Tell about that? A. Of course we had to give a deed of trust on our land to cover the damages. Q. (By THE COURT.) You say you had to do it? A. We had to do it, yes, or go to jail. Q. (By THE COURT) Did you sign the deed of trust? A. Why of course. Q. Why did you sign it? A. I wanted to shut off this jail-bird business. Q. Just state why you signed the deed of trust. A. To keep from being taken to prison. I never had been in prison and it kinda scared me a little to think about going there and so that's why I signed it. Q. (By THE COURT) Did you ever hear Mr. West order anybody to be arrested for anything that grew out of the closing of that bank? A. Never ordered them but he threatened to do it. Q. (By THE COURT) But you never heard him do so? A. I don't know as he ordered or had anybody arrested but he said he would do it if we didn't come across and fix that business up that day. Q. Tell how you came to

give the $12,000 deed of trust (the deed of trust to the insurance company executed approximately two months after this alleged conversation)? A. West said it would be a good idea for me to get some money, an Eastern loan, so we could have the money to run this new bank that was starting up there so I done it and had the $12,000 that they used in the bank to run the bank. Q. Why did you execute that mortgage (the $12,000 deed of trust)? A. Help out a little and start them at that time. Q. Mr. Woodward, how long was it after you gave this deed of trust for $17,000 until you found out that he couldn't have sent you to the penitentiary? A. I don't know. A year or two, I guess. Quite a bit.''

It will be recalled that Woodward, W. P. Harrington, Smith and the two Gabberts were the directors and officers of the bank at the time the bonds were appropriated and sold and the proceeds thereof placed in the assets of the bank. Plaintiff's evidence shows that Boge Gabbert thus appropriated some $30,000 face value of customers' bonds and that Woodward, Harrington, Smith and Lewis Gabbert were fully informed and knew about, at least, the appropriation and sale of the first $5000 in bonds and that the proceeds were placed in the assets of the bank. Plaintiff produced two other witnesses to testify to the so-called threats, alleged to have been made by West, Smith and Connelly Harrington, a brother of W. P. Harrington. Neither testified to having been present at the meeting which Woodward claims was held at the Drais home on the night of March 9, or to have heard the conversation between West and Woodward, which Woodward says occurred there, or to have heard the statements which Woodward says West made at that time. It will be recalled Woodward said Smith was present. The statements which Woodward says West made at the Drais home that night are the only ''threats'' to which Woodward testifies.

Smith testified that the meeting held on the night of March 9, was held at the bank ''in the director's room'' and that the defendant West, plaintiff Woodward, Drais, Williams, Skaggs, Boge Gabbert, Lewis C. Gabbert and himself were present. Smith further testified: ''I walked into the door and Mr. West was sitting right next to where I came in, and he turned around and I says, 'What do you men want me up here for? I thought we all had that fixed up at St. Joe today.' Mr. West says: 'Mr. Gabbert has just told me that there's a lot of those Liberty Bonds gone, $30,000 of them.' I says 'Why, I don't know nothing about the bonds being gone, don't know nothing about it.' 'Well,' he says, 'they are gone,' and he turned around then to Mr. Boge Gabbert and says, 'Mr. Gabbert, what became of those bonds?' He (Boge Gabbert) says, 'Bill Harrington got them.' 'Well,' I says, 'It ain't no trouble to overtake him. I met him getting on the interurban when I got off of it, coming from St. Joe, and going

South' and Mr. West says, 'call the Chief of Police at Kansas City and give a description of Harrington and have him stopped, arrested or something'—stopped. Well, they did. I believe Johnnie Williams first called and then Jim Drais took his place and give a description of Mr. Harrington, told about his size and I don't know what all, and they didn't get him, so he came back the next day.'' Continuing, Smith testified as follows: ''Q. Was Mr. Woodward there at that time (the meeting at the bank)? A. Yes, sir. We were all in the same room sitting around a table. Q. Tell the conversation? A. Well, there was three or four said we were all criminally liable for this bank shortage. Q. (BY THE COURT) Who were they that said that? A. Luke (Lewis C.) Gabbert and Boge Gabbert and Mr. West says, 'Yes you will all have to put up for this business.' Q. Did he say anything else? A. Yes, he said there would have to be something done, 'You all will have to put up,' but didn't anyone say at that time they were going to put up. . . . Q. Do you recall anything further Mr. West said in connection with these bonds? A. Yes. He said we would all have to put up for these bonds and the $7000 note we had put up quite a bit before that (August, 1921). Q. Do you recall him saying anything about what he would do? A. He said he would call an officer, that we would have to put up. Q. Was Mr. Woodward there at the time he said that? A. Yes, sir. Q. To whom was he talking when he said that? A. He was talking to all of us, five or six.''

Connelly Harrington testified to attending a conference ''in March, 1922,'' but the time is not otherwise fixed. However, he presumably refers to the meeting at the bank on the night of March 9. His brother, W. P. Harrington, who was a director and vice president of the bank and also employed in the bank during the time the bonds were taken, was not present and Connelly Harrington stated: ''I was acting for my brother.'' Connelly Harrington, testified in reference to this conference as follows: ''Q. Who was there when you got there? A. Mr. Woodward, Mr. Smith and Mr. West and in the bank besides these were Mr. Skaggs, Mr. Williams, Mr. Hull and Mr. Drais and possibly another one or two. Q. State what Mr. West said? A. Mr. West said he must get the matter fixed up at once for the reason he wanted to get it settled without any trouble but otherwise he would have to call an officer. Q. What was he saying about the matter to be settled? A. He said that the $30,000 to take care of these bonds must be paid and that it was up to Mr. Smith, Mr. Woodward and myself to pay it as the Gabberts had already turned over practically all they had to the bank to take care of their indebtedness.''

Though plaintiff testified to purported threats to call an officer, and as he understood have someone arrested, ''if we didn't come across and fix that business up that day'' it does not appear that he

or the others who had been directors when the so-called $30,000 "bond shortage" occurred agreed that night and at that time to pay it or give security for payment and plaintiff's witness. Smith said no one agreed "at that time . . . to put up" for this "bond shortage." At that same meeting and presumably because of the refusal of those upon whom the demand was made to agree to pay the shortage a resolution was adopted closing the bank and placing "its affairs and assets under the control of the bank commissioner" (Section 11700, R. S. 1919). The following morning the required notice was posted. The resolution recites that: "William E. West, state bank examiner, being present, reported a shortage appearing in the records of the bank in the customers' bond account of approximately $31,450, also other irregularities and a depleted reserve as well as considerable loss in the loans" and then formally places the bank under the control of the bank commissioner. The bank record shows directors, Williams, Skaggs, Drais and Woodward, present and that the resolution was adopted by the unanimous vote of the directors present. Plaintiff does not testify to any purported threat or threats, intimidation, or coercion by West at any time after the night of March 9. It is clear that thereafter West representing and acting for the "state banking department" (Art. 1, Chap. 108, R. S. 1919) continued to make the requirement and condition to the reopening of the bank and its continuance in business that not only the arrangement agreed upon at the stockholders meeting at St. Joseph be carried out, that is, that the two Gabberts turn over their property for the benefit of the bank as security for their indebtedness to the bank and the stockholders surrender all the capital stock and permit a re-issuance and sale thereof but also that the $30,000 "bond shortage" be made up. The evidence shows these conditions were later met and when fully complied with the bank was reopened some time the latter part of April (about April 27). The Gabberts conveyed all their property by deeds of trust to secure their indebtedness to the bank. The three others, Smith, W. P. Harrington and Woodward, who had been directors during the period the customers' bonds had been appropriated and sold and who had knowledge, at the time, that several of the bonds were being sold and the proceeds placed in the assets of the bank, agreed to "take up" the $30,000 bond shortage. Connelly Harrington (brother of W. P. Harrington) paid W. P. Harrington's one-third ($10,000) in cash. Smith and Woodward each executed a demand note in the amount of $17,000, being one-third of the bond shortage plus the $7000 ($7160, on which $160 had been paid) demand note which each had executed in August, 1921, in taking up the "Iron Company" bonds. Each secured the $17,000 demand note by a deed of trust on real estate in Platte County. The two Gabberts executed a note for $12,000 to Smith, Woodward and

Connelly Harrington securing it by deeds of trust on the same property which they had conveyed in trust to the bank subject to their deeds of trust to the bank. Plaintiff and his wife executed the $17,000 note and acknowledged the deed of trust, at their home, on March 16, 1922, only the notary public taking the acknowledgment being present. This deed of trust was not filed for record until March 27.

It appears that West representing the "State Banking Department" remained in immediate charge and control of the property and assets of the closed bank during the period the arrangements were being completed to reopen the bank. While these various matters were being adjusted and some time in April, Woodward went to St. Joseph seeking a time loan and personally entered into and conducted negotiations with an agent representing an insurance company which made farm loans. The negotiations culminated in a five-year loan by the insurance company to Woodward in the amount of $12,000 secured by a first deed of trust on the land on which he had given the bank a deed of trust securing the $17,000 demand note and that deed of trust was released. The five-year note for $12,000 and the deed of trust securing same were dated April 27, 1922, acknowledged by Woodward and wife, May 4, 1922, and filed for record May 13, 1922. West had nothing to do with the making of the loan or the execution of the note and deed of trust. Woodward does testify that he discussed the matter with West or West with him. It seems the bank examiner preferred as much cash as possible on hand in reopening the bank rather than the demand notes. Woodward stated that some time after March 16 (the time being indefinite) West advised him to get an "Eastern loan" and "I thought maybe by getting the loan I could probably pay it out sometime or other." His testimony along this line continues: "Q. What did he (West) say to you? A. He said he thought it would be better to take out an Eastern loan—would be easier on me, less interest, cheaper. Q. You knew at that time that if the transaction went through you would be making a time loan as against a demand loan which you already had at the bank? A. Yes. Q. And that was the object you had in doing it? A. Yes. Q. By this arrangement, you would be borrowing $12,000 of the amount in a time loan due five years in advance? A. Yes. Q. And you thought you could pay it out probably in that time? A. I didn't know but thought probably I might." The $17.000 demand note was then discharged in this way—the proceeds of the insurance company loan, $12,000, were applied thereon, Woodward was allowed a credit of $1600 for his own bonds in that amount which had been sold and the proceeds placed in the assets of the bank, and he and his wife executed a note to the bank for $3400 secured by a second deed of trust; this note and second deed of trust were dated

May 20, 1922, the deed of trust was acknowledged May 26, 1922, and filed for record June 3, 1922.

The evidence considered in the light most favorable to plaintiff falls far short of showing that the $12,000 note and deed of trust and the $3400 note and deed of trust were executed under the compulsion of threats and intimidations by West which so deprived plaintiff of free agency and judgment and voluntary action that at the time thereof plaintiff was "overcome," rendered "powerless" and unable to resist demands upon him and acted under duress, all as alleged in the petition. The following appears in cross-examination of plaintiff Woodward in reference to the $17,000 note and deed of trust: "Q. State to the court please Mr. Woodward why you signed the note for $17,000? A. To make up the deficiency." As to the $12,000 note to the insurance company the following appears: "Q. You were doing this and paying off this note (the $17,000 note), raising this money by means of the Life Insurance loan in order to help the re-organized bank? A. We tried to. Q. That was your purpose in all these things wasn't it? A. Oh, yes, mostly but I probably wouldn't have done that but they already had that lien." At another place in the cross-examination, the following statement as to motive is found: "Q. You were anxious to help this bank out? A. We wanted to help the bank out. Q. And that was your motive in everything you did—to help the bank get on its feet again? A. That's a fact. We tried to help them out . . . but when they got my place they soon got too short to do anything with."

Woodward knew that some of the customers' bonds had been appropriated and sold and the proceeds placed in the assets of the bank and the evidence shows it was done with his consent and approval. The following further excerpt from his testimony might well be set out in this connection. Woodward stated, that some time in 1921, "the bank was short of money" and "Billy (W. P.) Harrington and Boge Gabbert told me they were going to sell some of them bonds" (customers' bonds) and that he (Woodward) "told them it might be alright provided he (Boge Gabbert) could replace them when they (the owners) wanted them at any time and that is what they calculated to do. They didn't aim to do anything wrong but, then, of course, it has turned out wrong." An examination of Woodward's testimony in reference to the purported threats by West on the night of March 9, which he now claims "overpowered" his will and destroyed his free agency to such an extent that he executed the subsequent notes and deeds of trust, even at distant dates, under the compulsion and duress thereof, discloses the following. Woodward says that when West, having learned of the situation, told him (Woodward) "you are just as guilty as Boge Gabbert" that he told West

"it was a lie," that the statement made him "mad" and that if opportunity had offered he would have "scuffled" with West "right there." Apparently that accusation did not intimidate or coerce Woodward. Woodward's statements that West threatened to have him arrested and "he (West) gave us to understand we would be arrested" clearly do not purport to be a recitation of West's statements but at most Woodward's conclusion as to the meaning of the statement which he says West did make, that is, that if the "bond shortage" was not made good "he was going to call an officer." It must be conceded that if the shortage was not made good it was the duty of the bank examiner to lay the facts of the whole situation which he had uncovered before the proper officers. But the argument seems to be that the bank examiner's statement constituted a threat protending immediate arrest and incarceration, at that very time, unless Woodward, Smith and the others who had been directors when the shortage occurred agreed, then and there, to make the bond shortage good, was so understood by them, and that such conclusion was fortified by the action of West in directing that the Kansas City police "stop" W. P. Harrington if found there. Upon the statement of that incident as made by plaintiff's witness Smith, West's action seemed warranted by the circumstances and to have been at the suggestion and to have had the approval of those present. However as we have noted it appears that despite the so-called threat of immediate arrest, if West's alleged statement be so taken, the parties were not coerced thereby for plaintiff's evidence is that none of those involved would agree or promise that night to make up, or participate in making up, the bond shortage and therefore the board of directors that night adopted a resolution closing the bank and placing its assets and affairs in the custody of the bank commissioner. The arrangement to take care of the shortage and meet the requirements of the "state banking department" was thereafter entered into and it seems an inescapable inference, from plaintiff's own evidence, that it was by mutual agreement among the parties and on that basis. Plaintiff paid interest several years on the $12,000 loan. As stated both the $12,000 deed of trust and the $3400 deed of trust were foreclosed in 1927 and thereafter, and in April of that year, plaintiff brought this action.

So far as the evidence shows plaintiff did not, at any time from and after the night of March 9, 1922, when he says the purported threats relied upon were made, to March 16, 1922, when he and his wife executed the $17,000 note and deed of trust, make any complaint or remonstrate against the arrangement which he and his associates had entered into for the purpose of taking up the "bond shortage" and otherwise putting the affairs of the bank in condition to meet the requirements of the "banking department" for reopening the bank or

express any dissent thereto or desire to withdraw therefrom. Nor during the period of approximately two months intervening before the loan from the insurance company was completed and the money paid over and the $17,000 note held for the benefit of the bank discharged did he make any complaint or question his liability. Though during such period the bank held the $17,000 note and deed of trust with full knowledge on the part of its officers and directors, and all parties concerned, as to the circumstances surrounding their execution Woodward did not repudiate them or make any claim of fraud or duress or seek to have them canceled on such grounds. Plaintiff's evidence does show that plaintiff and the others concerned entrusted the preparation of both his own and Smith's note and deed of trust, each for $17,000, for the benefit of the bank, the Gabberts.' deeds of trust for the benefit of· the bank and the Gabberts' deed of trust to Woodward, Smith and Connelly Harrington, to Attorney Lewis C. Gabbert, who had long been associated with Woodward as a director in the bank and as attorney for the bank, and that during the period these various instruments were being prepared and the other arrangements for reopening the bank completed, under the supervision of Lewis C. Gabbert, numerous conferences were necessarily had by the parties to the arrangement. Thus Woodward had ample opportunity and time for investigation and deliberation and to freely consult with whomsoever he saw fit. He was a mature man of business experience and the reasonable inference follows that under the circumstances he acted after deliberation and consideration.

In suits to invalidate a contract on the ground of duress the general rule is that ''duress will not ordinarily invalidate a contract entered into after opportunity for deliberate action.'' [13 C. J., p. 397.] How then can it be said upon facts such as we have in the instant case, as shown by plaintiff's evidence, that with full knowledge of the facts of the situation and ample time and opportunity for full and free, investigation, deliberation and reflection, Woodward's claim of duress has been sustained? [Clement v. Buckley Mercantile Co., 172 Mich. 243, 137 N. W. 657; Whitman Realty & Investment Co. v. Day, 161 Wash. 72, 296 Pac. 171; Bennett v. Luby, 112 Wis. 118, 88 N. W. 37; Zimmermann v. Benz, 162 Minn. 47, 202 N. W. 272.] In our opinion these facts, shown by plaintiff's evidence, do not afford a basis for a reasonable inference that when seven days after the alleged threats were made Woodward executed the $17,000 note and deed of trust and when approximately two months thereafter he executed the $12,000 note and the $3400 note and the deeds of trust he was, by reason of the alleged threats, bereft of free will and the power of voluntary action, and acted under duress as that term is understood and applied by the courts but rather negative such claim and that the indubitable inference therefrom is that in the execution

of the notes and deed of trust Woodward exercised his own deliberate judgment motivated by a sense of legal or moral responsibility, the thought that under the circumstances what he was doing was what he ought to do, and for the purpose of furthering the consummation of the arrangement with his associates for reopening the bank. We have not drawn upon the testimony of Williams, Skaggs and Drais (new directors elected at the annual meeting late in January, 1922), who plaintiff says were present at the time the alleged threats were made or defendant himself, all being witnesses for defendant, but their testimony lends no support or sustenance whatever to plaintiff's claim of duress.

The cases cited by appellant (plaintiff below) are all cases in which it was sought to rescind a contract or defend against the enforcement of a contract or the collection of a note wherein the party alleged to be guilty of duress was the beneficiary. It would serve no purpose to review the cited cases here and we deem it sufficient to say that as bearing on the question under consideration, that is, whether plaintiff made a submissible case, such cases are not comparable on the facts. It is our conclusion therefore that the evidence, viewed in the light most favorable to plaintiff's claim, is not of the substantial nature required to make a prima facie showing of duress and take the case to the jury and that defendant's request for a directed verdict, at the close of the evidence, should have been granted. With this view it will not be necessary to discuss the instruction complained of, alleged error in which was specified as ground for the order granting a new trial. The order of the trial court granting a new trial is therefore affirmed. *Hyde* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.