Blanche ENSIGN, Elizabeth Liebling, and
Phil Kaufman, Appellants,

v.

HOME FOR the JEWISH AGED,
Respondent.

No. 22122.

Kansas City Court of Appeals.
Missouri.

Jan. 10, 1955.

John M. Cleary, Jr., Kansas City, for appellants.

Rich & Rich, Isadore Rich, Kansas City, for respondent.

DEW, Judge.

Plaintiffs sued to cancel their joint promissory note for $2,500, payable to defendant on demand, on the ground that they executed it under duress. Defendant denied the plea of duress, pleaded valid consideration and filed the note as a counterclaim. The court found the issues for the defendant on the plaintiffs' petition and sustained its counterclaim in the amount of $2,500. Plaintiffs have appealed.

It is alleged in the plaintiffs' petition that defendant is a corporation, doing business as a home for the aged; that it makes certain charges for board and lodging furnished aged persons placed in its care; that plaintiffs placed their mother in said Home and agreed to pay and did fully pay said charges for her care from the date of her entrance until her death, a period of fifteen weeks; that defendant induced plaintiffs to execute their note for $2,500, due on demand, payable to defendant; that plaintiffs did execute said note under duress, in that they did so because defendant threatened to prevent their mother from entering said Home when she was ill and in need of care furnished there; that plaintiffs' signatures to the note were not their free act and deed, their free will being overcome by the above threat and their mother's serious condition, and plaintiffs would not otherwise have signed the note; that the note called for payment far in excess of actual charges made by defendant for the services provided; that the note was without consideration and void. It is further alleged that the note was negotiable, and plaintiffs have no adequate remedy at law, being faced with a multiplicity of suits and irreparable injury. It was prayed that the court require defendant to produce the note; that the court decree it null and void, and to grant the plaintiffs such further relief as the court may deem proper.

The answer denied the controversial allegations of the petition; asserted that defendant is a charitable nonprofit organization; that it has no outstanding stock and declares no dividends; that none of its receipts inure to the benefit of any person, firm or corporation; that it makes no certain charges for care of aged persons; that it is maintained solely by charitable contributions from its residents, their familys, and assistance from the United Funds of Kansas City, Missouri. The answer averred that plaintiffs' mother was received as a resident of the Home, and that plaintiffs agreed to pay certain amounts as charity to the institution on condition of her admission and care, and are still indebted to defendant in the sum of $2,500. The answer alleged that defendant was never obliged to admit the mother of plaintiffs but that plaintiffs voluntarily agreed to contribute certain charity

to the Home, including the note referred to in plaintiffs' petition. It was further stated that many of the residents of the Home are without funds, which must be obtained for their care from the charity of others; that plaintiffs' mother was first refused admission because her husband and the plaintiffs were people of sufficient means to care for her elsewhere; that plaintiffs repeatedly urged defendant to receive their mother and offered said note for $2,500 as an inducement for such admission, and said note was tendered and delivered as a charitable contribution to defendant and to its purposes, and not otherwise. By amendment the defendant pleaded the note referred to as a counterclaim.

According to the evidence Mrs. Tillie Kaufman was 77 years of age at the time of her death on April 23, 1951. For many years she and her husband Nathan Kaufman, aged 85 years, had been separated. He paid her $75 a month for her support. The plaintiff Mrs. Ensign, a daughter, is a widow, and lives with her children in Garrison, Kansas, where she is employed. The plaintiff Mrs. Liebling, another daughter, lives with her husband, a grocer in Kansas City, and she is employed as a typist. Plaintiff Phil Kaufman, a son, owns and operates a window shade business in Kansas City, and lives in that city with his family. For many years Mrs. Kaufman had expressed a desire sometime to become a resident of the defendant Home of which she always said she was a "member". No evidence of any such membership was produced except a suggestion that at one time she may have been a member of a Ladies Auxiliary interested in the Home, and that the dues of such members were $3 a year.

In 1950, when plaintiffs' mother was 76 years of age, she had a heart attack. Her daughter, Mrs. Liebling, sent her to Research Hospital in Kansas City. After three weeks she was brought back to Mrs. Liebling's home. Six weeks later she was taken to a convalescent home. She was unhappy and lonely there and in ten days was again sent to the hospital. After six or eight weeks she moved to a private kitchenette.

Plaintiff Phil Kaufman had a family, was in debt, had sickness in his home, and it was felt that he had no place to keep his mother. Neither of the other plaintiffs was situated so as to give her mother suitable lodging and care in her home. It being difficult to find a housekeeper to stay with Mrs. Kaufman all the time and take care of her, an application was made in December, 1950, for her admission to defendant's Home. A meeting was had between plaintiffs, Mrs. Liebling, Phil Kaufman and the defendant's Board of Governors.

According to the plaintiffs' evidence, they were told by counsel for defendant, who was present at the meeting with defendant's Board, that plaintiffs' father had been investigated, was a man of means and that it would take $5,000 to get their mother in the Home; but that since the plaintiffs did not have the money, it would take a lawsuit against the father to get it. Mrs. Kaufman became ill at this meeting and was taken away. Plaintiffs were told at the meeting that the suit against their father would have to be for $10,000, of which the defendant would receive $5,000, and the balance would go for fees. These requirements were told to plaintiff Mrs. Ensign in December, 1950, when she arrived in Kansas City. An agreement was later signed by plaintiffs with the defendant's counsel to bring such an action against Nathan Kaufman, which agreement was later abandoned and no suit was brought, on account of other arrangements made by plaintiffs to raise the funds; that is, Mrs. Ensign decided that since the suit would be hard on her mother and the Home would get only $5,000, and since the suit would be against her father, then 82 years old, and wreck his estate, and make him, too, dependent on the plaintiffs, therefore, she offered to raise $2,500 in cash out of her own savings, to pay defendant, and suggested that the three plaintiffs guarantee the payment of the other $2,500 when the father passed away. This proposition, believed by plaintiffs necessary to gain admittance for their mother, and to prevent a suit against their aged father, was made to the defendant, which accepted it with the additional requirement that plaintiffs pay $150 a month

to the defendant Home while their mother remained a resident.

The evidence of the plaintiffs further tended to show that on December 27, 1950, all the plaintiffs signed and delivered the note for $2,500, payable on demand, to the defendant, and that Mrs. Ensign, on December 28, 1950, mailed from Topeka, Kansas, $2,500 in cash to defendant. She and Mrs. Liebling also paid the $150 a month during the fourteen weeks and a fraction which their mother spent in the Home prior to her death. About a year and a half after her death, defendant demanded of the plaintiffs payment of the note. The plaintiff Mrs. Ensign wrote in reply that the plaintiffs understood the note was only a confirmation of a promise to pay $2,500 out of their father's estate when he died.

According to the evidence produced by the defendant, the first application by the plaintiffs for the admission of Mrs. Kaufman was heard at length by the Board of Governors and referred to its investigating committee, and a conclusion was reached that the husband of the applicant was a man of ample means, possessing property worth at least $100,000, and well able to pay for the support of the applicant, and that other members of the family were able to contribute toward her support; that the defendant is a charitable organization, operating without profit, has no stock and declares no dividends; that it depends for its maintenance upon the contributions made by the residents, their families, other donations, and assistance from United Funds of Kansas City, Missouri; that it is the policy of the institution to require payments from those residents accepted who are financially able to do so, otherwise the institution would be unable to care for the inmates who have no funds from any source. There was further evidence that the only references to the liability of Mrs. Kaufman's husband for her support were made during the discussion of her application in their presence with the Board, and no requirement was ever made that a suit be brought by the applicant against her husband, and no contract was ever entered into between their counsel and the plaintiffs to bring such an action, and no such action was ever brought, or any fees charged or paid therefor.

The evidence of the defendant was further to the effect that during the stay of Mrs. Kaufman in defendant's institution, she required the services of nurses around the clock, and frequent use of oxygen. The president of the organization was asked if, considering the charge of $36 a day for nursing, $15 a day for room, totaling $357 a week, plus the cost of medicines and oxygen he thought that the requirement that the plaintiffs pay $150 a month for their mother's care and lodging, plus the contribution of $5,000 to the Home was excessive. The witness answered: "May I answer that in this way. I looked up and this woman used about 75 tanks of oxygen, besides the doctor. The nursing service there is 24 hours a day, and as a rule, out there, people get along much better than (in) hospitals, because it is like a mother, or daughter, or a sister, or brother, taking care of a person, it isn't routine. When a person comes into the Home we don't know whether they are going to live one day, or whether they are going to live ten years. And if they passed away the next day, they are given to understand that that is what they are paying, and that is all there is to it, and if they live ten years, they are not obligated to do any more". Witness positively denied that they had at any time threatened the plaintiffs in any manner.

Appellants' first point of error is that the court erred in excluding the testimony of the plaintiffs concerning their state of mind induced by the threats and actions of defendant. No specifications appear under this point, but in the argument thereunder two specific references are made to the testimony in question. The first relates to testimony of Mrs. Ensign as to extended conversations with her sister, Mrs. Liebling, outside the presence of any representative of defendant, and pertaining to the financial transactions plaintiffs understood were necessary to obtain their mother's ad-

mittance to the defendant Home. Objection was made to such conversations as self-serving and a motion was made that they be stricken and disregarded. Counsel for plaintiffs explained to the court that it was not sought to show the truth of the matters being inquired about, but the purpose was to show the state of mind of the plaintiffs when executing the note in question. The court sustained the objection but permitted the testimony to be admitted for the purpose only of preserving it for review on appeal. Section 510.310 RSMo 1949, V.A. M.S.

After the court had admitted the conversations for the record only, the witness Mrs. Ensign, thereupon proceeded to relate the conversations had with her sister out of the presence of defendant or its representatives, wherein they expressed their understanding that defendant was demanding that a suit be brought against their father for $10,000, out of which the Home would receive $5,000 only, and that defendant would not admit Mrs. Kaufman unless it received $5,000 and $150 a month in addition; whereupon, witness stated that she proposed to her sister that the suit against their father be dropped, and that in lieu thereof that she would volunteer $2,500 in cash out of her savings, and that the three plaintiffs sign a note for the balance of $2,500 to be paid when their father died, and that they also would guarantee the $150 a month. The court did, however, sustain objection to the following question propounded to witness Ensign and did not permit any answer: "What was your state of mind, or condition of your mind at that time?"

As to the second specification of testimony pertaining to the state of mind of the plaintiffs referred to in plaintiffs' brief, witness Mrs. Liebling was asked: "Had you not signed this note, was it your opinion that these lawyers would go ahead with this lawsuit by your mother against your father?" Objection was made that the question called for a self-serving answer. Plaintiffs' counsel again explained that it was· offered to show state of mind. The court ruled that he would receive it as "other hearsay evidence" had been received. Witness then answered: "Yes, I thought they would".

Defendant's argument on plaintiffs' first point is that the court's rulings on the evidence are immaterial because the plaintiffs failed to plead or prove a submissible case. It contends that plaintiffs failed to plead or to prove duress. It is true that in many jurisdictions it is held that conduct, in order to constitute duress, must be wrongful. Restatement of the Law of Torts, Chapter 43, page 420, par. f; First State Bank v. Federal Reserve Bank, 174 Minn. 535, 219 N.W. 908, 61 A.L.R. 467; Morton v. Morris, 8 Cir., 72 F. 392. However, the rule in Missouri is not so limited. "The modern rule of duress as established by the above cases is that 'duress is to be tested, not by the nature of the threats, but rather by the state of mind induced thereby in the victim'; and that 'the ultimate fact in issue is whether the alleged injured party was bereft of the free exercise of his will power; and of which, the means used to produce such state of mind, the age, sex, capacity, situation, and relation of the parties, are all evidentiary' ". Weisert v. Bramman, 358 Mo. 636, 216 S.W.2d 430, 434.

It is said in Coleman v. Crescent Insulated Wire & Cable Co., 350 Mo. 781, 790, 168 S.W.2d 1060, 1066: "As to the issue of duress: it is sufficient to constitute duress, which will avoid a contract, or other instrument, that one party thereto is prevented from exercising his free will by reason of threats made by the other, and that the contract is obtained by reason of such fact. The test·is the state of mind induced by the threats made. The character of the threats is not so material, it being sufficient to constitute legal duress, if they deprive the party purporting to be obligated of his free moral agency". See also Mississippi Valley Trust Co. v. Begley, 298 Mo. 684, 252 S.W. 76. In Steinger v. Smith, 358 Mo. 39, 46, 213 S.W 2d 396, 400, the Supreme Court again recognized the rule of duress as now expanded

by modern application, but it did cite Restatement of the Law of Torts, supra, which stated that the threats must be wrongful. The court, however, in that case, said it was not necessary to "search for the limits of the modern expansion of the field of duress" since the plaintiff in that case did not urge duress. We understand, therefore, that under the rule of duress in Missouri, as quoted from the Coleman and Weisert cases, supra, the threats relied on need not be wrongful or illegal.

We consider, then, the question whether the testimony on the part of the plaintiffs referred to above, offered to prove "state of mind" of the plaintiffs, was admissible. White v. Scarritt, 341 Mo. 1004, 111 S.W. 2d 18, 24, was a case to recover money paid under alleged extortion, coercion and duress in consideration of the dismissal of an injunction suit against Jackson County, Missouri, which would prevent the county from proceeding to build a court house on property which the plaintiff White desired to sell to the county for that purpose, from which property the plaintiff's tenants had already moved. The injunction suit was also consuming the period of the option of purchase authorized by the county court. The Supreme Court considered the defendant's complaint that the trial court erred in admitting evidence tending to show "the physical, mental, and financial condition of plaintiff during the negotiations and at the time of signing the agreement". The court further said: "Clearly, it was competent to show the effect of said suit on plaintiff's mind, health, and property interests. If the suit did not affect her, there could be no duress. It was proper to permit plaintiff and others to testify as to said conditions after the filing of the suit and during the negotiations with reference to the same". Similarly, the court in the instant case, in our opinion, should have admitted the evidence offered by the plaintiffs which might tend to show their state of mind when about to enter upon the transaction with the defendant for the admittance of their mother as a resident, as pleaded in the petition.

The further inquiry as to whether or not, under the whole record, the rejection of such evidence could or should change the result reached by the trial court, is so related to the appellants' second point that we deem it best to consider them together. Appellants' second point is that the finding and judgment are not supported by the evidence and are against the weight of the credible evidence. It was admitted by plaintiff Mrs. Ensign during her testimony, that neither she nor her mother was solicited by the defendant for Mrs. Kaufman's admission to the Home; that nobody threatened her except that the attorney said "they were going to sue my father". The note which she signed bears the date of December 27, 1950. She wrote to the defendant on December 28, enclosing money order for $2,500 to apply on the agreement to admit her mother, and advised that she had also signed the guaranty for $150 a month, and had signed the note which her brother would also sign and mail to the defendant. She had testified incorrectly that she did not sign the note until after she had paid the $2,500. Nearly two years later, September 15, 1952, after having just received a demand for the payment of the note, she wrote from Topeka to the defendant that she had talked the matter over with her brother and sister and that they understood the $2,500 represented by the note was to be paid out of the estate of her father at his death. On December 20, 1952, she again wrote that she had talked with her father, who had agreed to discuss the matter with an attorney, and that she would soon come to Kansas City to talk the whole matter over with the defendant and to examine certain papers signed by her mother upon entering the Home. At no time, according to the record, did plaintiff Mrs. Ensign suggest that when signing the note or in paying the $2,500 in cash or $150 a month was her mind overcome by the threats or conduct of the defendant, and that any part of the transaction should be considered void.

Mrs. Liebling testified that she signed the note because there was nothing left to do, but admitted she was not threatened

by the attorney for the defendant; that she paid no part of the $2,500 although she paid a part of the $150 a month, her brother paying none. She said that she remembered that she was willing to sign the note, and the contract for $150 a month. She added that nobody representing the defendant was present when she signed the note or the contract for monthly support.

Defendant Phil Kaufman testified that he did not remember who was present when he signed the note, but he did so to get his mother into the Home. He said he signed it unwillingly. The record discloses nothing further tending to show any influence brought to bear upon the plaintiffs to induce them to execute the promissory note or to pay the cash agreed to.

■ A vital principle of the law of duress is stated in Weisert v. Brammen, supra, 216 S.W.2d loc. cit. 434: "However, it is also the general rule that a claim of duress cannot be sustained where there is full knowledge of the facts of the situation and ample time and opportunity for full and free investigation, deliberation and reflection. Tanner v. West, 339 Mo. 738, 99 S.W.2d 7". In Tanner v. West, referred to in the Weisert case, supra, the Supreme Court said in 339 Mo. at page 752, 99 S.W.2d at page 16: "In suits to invalidate a contract on the ground of duress the general rule is that 'duress will not ordinarily invalidate a contract entered into after opportunity for deliberate action.' 13 C.J. p. 397. How then can it be said upon facts such as we have in the instant case, as shown by plaintiff's evidence, that with full knowledge of the facts of the situation and ample time and opportunity for full and free investigation, deliberation, and reflection, Woodward's claim of duress has been sustained?"

■■ Granting the truth of the rejected evidence offered by the plaintiffs to prove their state of mind in the execution and delivery of the note here in suit, such facts, when considered with all the evidence and viewed in the light most favorable to the plaintiffs, did not, in our opinion, present a basis for a reasonable inference that plaintiffs were thereby bereft of their free will or power of voluntary action and acted under duress, as defined by our courts. The opportunity offered the plaintiffs for deliberation, investigation and reflection over the periods of time involved, with full knowledge of the facts, nullifies the plea of duress. It was said in Bowman v. Kansas City, Mo., 233 S.W.2d 26, 29: "In an equity case, which we try de novo, this court is not required to reverse a judgment because of the chancellor's incorrect rulings on evidence, but this court on appeal usually 'considers such evidence in the record as it deems admissible, excludes from consideration evidence improperly admitted, and reaches its judgment on the competent evidence offered without regard to the trial court's rulings.' Snow v. Funck, Mo. Sup., 41 S.W.2d 2, 5". We cannot say that the judgment is unsupported by the evidence and is against the weight of the credible evidence.

■ While the plaintiffs' Point II does not specify it, the argument thereunder includes a contention that the charge of $5,000 and $150 a month was excessive and unconscionable. There is a principle of equity whereby, when a person comes into a court of equity to seek specific performance of a contract, he will be denied performance, even in the absence of fraud, mutual mistake of fact, or mental incapacity, if the contract is "unfair, overreaching, biting". Beheret v. Myers, 240 Mo. 58, 77, 144 S.W. 824, 830. In such a case, Miller v. Coffeen, Mo., — S.W.2d —, the Supreme Court refused specific performance because the consideration of the contract was harsh, biting, oppressive, disproportionate and shockingly inadequate. However, it cannot be said that such elements were established in the instant case, even if otherwise applicable.

■ Plaintiffs' last point is that the trial court erred in admitting prejudicial evidence as to plaintiffs' father and as

to plaintiff Phil Kaufman's religion. There is no specification as to what evidence pertaining to the father is referred to and the point in that respect is too general for us to review. Ambrose v. M. F. A. Co-operative Ass'n of St. Elizabeth, Mo., 266 S.W.2d 647. It is complained that on cross-examination of plaintiff Phil Kaufman it was brought out that he had become converted to and had joined the Catholic Church in 1953, and practically all of his life had been of that faith; that he contributed about a dollar a week to the charities of that church; that while one of his children attended a public school and one an art school, his small daughter was sent to a Catholic School, where she received her general education, lessons in ballet dancing, piano and swimming, and received noonday lunches, for all of which he paid that school $300 a year. It is urged that the purpose of such testimony was to prejudice the court, and that such purpose was at least partially successful inasmuch as the court, in commenting on its judgment at the time of its rendition, said that the court hoped defendants would not issue execution against the plaintiffs Mrs. Ensign and Mrs. Liebling. However regrettable it was, in order to show Phil Kaufman's ability to contribute toward his mother's care in defendant's institution for the Jewish Aged, that his and his children's affiliation with the Catholic Church was elicited, the record shows that plaintiffs made no objection whatever to the admissibility of this evidence and they are now in no position to charge the court with error because of its admission. The point is overruled.

It is our conclusion, in view of all the evidence, that the plaintiffs failed to establish any threats on the part of the defendant sufficient in law to constitute duress, such as to invalidate the promissory note of the plaintiffs sued upon. It follows that the court was correct in its judgment against the plaintiffs on their petition and in finding the issues for defendant on its counterclaim. Judgment affirmed.

All concur.